1  JEFFREY KALIEL, California Bar No. 238293
   **TYCKO & ZAVAREEI LLP**
2  483 Ninth Street, Suite 200
   Oakland, CA 94607
3  Telephone (510) 254-6808
   Facsimile (202) 973-0950
4  *jkaliel@tzlegal.com*

5  *Attorney for Plaintiffs*
   *Additional Attorneys on Signature Page*

6

7

8                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF CALIFORNIA**
9
   JUAN QUINTANILLA VASQUEZ and          Case No. 3:17-cv-755
10 GABRIELA PERDOMO ORTIZ, individually
   and on behalf of all others similarly situated,   **CLASS ACTION COMPLAINT**
11
                                         **JURY TRIAL DEMANDED**
12              Plaintiffs,
                                         1. Violation of the "Unfair" Prong of the
13        vs.                            Unfair Competition Law, Cal. Bus. & Prof.
                                         Code §§. 17200, et seq.
14                                       2. Violation of the "Fraudulent" Prong of the
                                         Unfair Competition Law, Cal. Bus. & Prof.
15 LIBRE BY NEXUS, INC. and JOHN DOES 1-50,  Code §§. 17200, et seq.
                                         3. Violation of the "Unlawful" Prong of the
16              Defendants.              Unfair Competition Law, Cal. Bus. & Prof.
                                         Code §§. 17200, et seq.
17                                       4. Violation of the Consumers Legal Remedies
                                         Act, Cal. Civ. Code §§ 1750, et seq.
18                                       5. Violation of the California Translation Act,
                                         Cal. Civ. Code § 1632
19                                       6. Violation of the Prohibition on Peonage, 18
                                         U.S.C. § 1581
20                                       7. Violation of the Prohibition on Forced
                                         Labor, 18 U.S.C. § 1589
21

22                      **CLASS ACTION COMPLAINT**

23        Plaintiffs Juan Quintanilla Vasquez and Gabriela Perdomo Ortiz ("Plaintiffs"), on behalf of

24 themselves and all others similarly situated, allege the following based upon personal knowledge as

25 to allegations regarding Plaintiffs and on information and belief as to other allegations:

26                             **INTRODUCTION**

27        1.    This is a civil class action seeking monetary damages, restitution, injunctive and

28 declaratory relief from Defendants Libre by Nexus ("LBN") and John Does 1-50 (collectively,

"Defendants"), arising from their exploitation of Spanish-speaking migrant detainees with so-called "lease agreements" for GPS trackers.

2.     U.S. Immigration and Customs Enforcement ("ICE") detains thousands of undocumented immigrants each year. Once in detention, detainees who are deemed to not pose a flight risk or a threat to public safety are afforded the opportunity to post bond. Bond is typically set at an amount that well exceeds the detainees' ability to pay, forcing them to obtain third-party financing or remain in detention.

3.     Some bond financing companies in the marketplace offer reasonable options in light of credit risk. But LBN preys on detainees' vulnerability and limited understanding of English to foist crushing financial terms and GPS shackles on detainees in exchange for its "service" of arranging for a third party to post detainees' bonds. Contrary to its marketing representations, LBN is not in the business of helping as a neutral advisor for families who would like to get a loved one out of immigration detention. Rather, LBN is in the business of leasing GPS trackers under false pretenses, and forcing detainees to haul and charge them, day-in and day-out.

4.     Contrary to its misrepresentations, LBN has no association with ICE, and no power to invoke the powers of ICE or otherwise incarcerate its consumers. LBN, however, takes advantage of these misrepresentations and fear of ICE detention and incarceration to extort payment of fees and continued shackling to the GPS trackers.

5.     Detainees' lack of knowledge about immigration bail bond offerings and limited English-language ability are the bedrock of LBN's business. Using targeted English-language misrepresentations and omissions, LBN appends GPS monitors onto the bodies of detainees, and levies exorbitant fees—nearly $10,000 in the first year alone—for doing so. LBN forces detainees to sign an unconscionable English-language GPS ankle bracelet "lease" agreement on its customers while providing a Spanish disclosure that never tells the true costs of the supposed "bargain."

6.     That supposed lease agreement allows LBN to install faulty ankle GPS tracking devices on detainees—devices which the company knows are defective, prone to cause injury, and which require wearers to charge the devices for hours while tethered to the wall.

7.      The process by which detainees enter into supposed lease agreements, and append GPS trackers to their bodies, is rife with misrepresentations. Specifically, LBN misrepresents the *amount* of fees detainees will be liable to pay LBN. And LBN misrepresents the *nature* of those fees in numerous ways, as discussed herein.

8.      Through its false and deceptive advertising and pricing scheme, LBN violated (and continues to violate) California law prohibiting misleading sales practices. Specifically, LBN violated (and continues to violate) California's Unfair Competition and False Advertising Laws, *Business & Professions Code* §§ 17200 and §§ 17500, *et seq.* (the "UCL"), and the California Consumers' Legal Remedies Act, *California Civil Code* §§ 1750, *et seq.* (the "CLRA").

9.      From its use of an English-language rental agreement with only selective Spanish-language disclosures, LBN violated the California Translation Act, *California Civil Code* § 1632.

10.     Plaintiffs, individually and on behalf of all others similarly situated, seek declaratory relief, damages, restitution, and other equitable remedies, including an injunction under the UCL, FAL and CLRA.

11.      LBN violates the Federal Prohibition on Peonage, 18 U.S.C. § 1581, and the Federal Prohibition on Forced Labor, 18 U.S.C. § 1589. Plaintiffs, individually and on behalf of all others similarly situated, seek compensatory damages, liquidated damages, punitive damages, declaratory relief, and other equitable remedies, including an injunction.

## **PARTIES**

12.     Plaintiff Juan Quintanilla Vasquez is an individual who resides in the city of Oakland, California. In reliance on LBN's false and deceptive advertising, marketing, and pricing schemes, Mr. Vasquez paid LBN for rental of a GPS ankle monitor, beginning on April 1, 2016. As detailed herein, Plaintiff was damaged as a result thereof.

13.     Plaintiff Gabriela Jamileth Perdomo Ortiz is an individual who resides in the city of Oakland, California. In reliance on LBN's false and deceptive advertising, marketing, and pricing schemes, Ms. Ortiz paid LBN for rental of a GPS ankle monitor, beginning on August 1, 2015. As detailed herein, Plaintiff was damaged as a result thereof.

14.     Defendant LBN is a corporation duly organized and existing under the laws of the State of Virginia, with its principal place of business at 113 Mill Place Parkway, Suite 103, Verona, Virginia 24482.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the members of the putative Class exceed $5 million, exclusive of costs, and at least two members of the proposed Class are citizens of a different state than LBN.

16.     The Northern District of California has personal jurisdiction over LBN because LBN is licensed and doing business in Alameda County, California, authorized to do business in California, and has sufficient minimum contacts with California, having intentionally availed itself of the California market so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

17.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391, because Plaintiffs are residents of Alameda County, California; Defendant LBN operates an office location in or near Alameda County, California; and because the events giving rise to the claims occurred in significant part in Alameda County, California.

## FACTUAL ALLEGATIONS

18.     According to its website LBN is part of Nexus Services, organized and existing under the laws of Virginia, with its principal place of business at 113 Mill Place Parkway, Suite 103, Verona, Virginia 24482. Upon information and belief, Nexus Services is engaged in the business of, among other things, providing electronic monitoring services in connection with immigrant bond securitization.

19.     The company has undergone massive growth since 2013, and now has at least 26 offices nationwide, including six in California.

20.     According to its website, "When you secure an immigration bond through Libre, you pay a premium payment to the bond company, which is based upon the total amount of the bond.

Libre by Nexus is required to charge this fee and it is the fee of the bond company. Libre by Nexus does not keep any of that money. Libre by Nexus also charges a service fee and a GPS installation and tracking fee. Normally the total amount paid is roughly 20% of the bond. You are not required to pay collateral when using the GPS bracelet!"

21.    LBN thus represents that its fees represent payments for the provision of the GPS tracker. That is false.

### LBN MISREPRESENTS ITS PURPORTED SERVICES

22.    During the Class Period (defined below), LBN marketed its services to detainees in the custody of ICE for whom a bond—usually in amounts between $10,000 and $20,000—has been set. For detainees who cannot post that cash up front, LBN arranges for bail bonds through third parties. It purports to "securitize" those bonds via placement of GPS ankle monitors on immigration detainees, which purportedly keep detainees from fleeing.

23.    Immigration bail bonds without GPS tracking are readily available in the marketplace for immigration detainees unable to pay the full amount of the bond in cash while their case is pending in immigration court. Typically, the cost for such bonds is between 10%-20%, and usually requires additional collateral (in the form of real estate or personal property) as a security. Typically, the 10%-20% up-front fee is the only *non-refundable* payment to an immigration bail bond company.

24.    LBN, on the other hand, charges a bond security payment of 20%—at the highest end of the going rate in the industry—*plus* demands additional nonrefundable payments of $880 up front and then $420 a month in perpetuity. To illustrate the unconscionable nature of these charges: on a $10,000 bond, a consumer will pay to LBN approximately $9,000, *nonrefundable*, in the first year.

25.    In short, there is little or no rational reason for detainees to choose to pay LBN's massive fees. Yet through the use of aggressive and deceptive sales practices, LBN is able to affix a GPS ankle monitoring device on the detainees, which they must wear at all times, and charge them the unconscionable and debilitating price of $420 a month, plus an $880 activation fee, to "lease" the device.

26.     All in all, this is a shockingly bad deal, even relative to the other bad options available to immigrant detainees, and is unconscionable on its face. Moreover, LBN is only able to foist this one-sided deal on consumers because it engages in a systematic campaign of misrepresentation and omission with its indigent, Spanish-speaking clientele, who are under the duress of detention.

27.     Indeed, LBN's customers overwhelmingly possess limited or no ability to communicate in, or read, English. Yet virtually all "contract" documents provided by LBN are solely in English.

28.     The detainees enter into the "bargain" only because LBN's misrepresentations and omissions leave them with little idea as to the reality and implications of the lease agreement. For example, LBN *never once* informs its consumers in the Spanish-language documents provided that they will be liable for a $420 monthly fee after making initial payment of the 20% and activation fee, much less *indefinitely*, and much less that the fee is not being used to pay down the debt of the bond.

29.     Rather than communicating the purported benefits and risks of its "services" in a clear, straightforward, and comprehensible fashion, LBN makes numerous misrepresentations and material omissions during the high-pressure ankle monitor bracelet sign-up process.

30.     First, written materials provided to detainees and their families are almost exclusively in English, despite LBN's knowledge that virtually none of the detainees they target are able to understand and read English. To wit, LBN asks detainees to sign a lengthy and dense "lease" agreement, almost all in English. The only information provided in Spanish is a one-page "key facts" document, which actually *conceals* the most material facts about the nature of the accompanying agreement.

31.     Second, LBN misrepresents its association with ICE in order to confuse detainees and their families by creating the impression that LBN is an official organ of the U.S. Government, with the power to determine whether a detainee is released or detained. In reality, LBN has zero formal association with ICE, and has no power to order release or detention of immigrants.

32.     <u>Third</u>, LBN misrepresents the financial implications of the arrangement. It never discloses in writing in Spanish that detainees will be required to pay $420 a month in perpetuity. Moreover, LBN leads detainees to believe that the exorbitant monthly payments made to "lease" the ankle shackles are actually payment for their outstanding bond amount. In reality, the crippling $420 fee in no way reduces the bond amount the migrant detainees owe.

33.     <u>Fourth</u>, LBN charges an initial fee for affixing and activating the ankle shackle, plus $420 a month. LBN fails to inform detainees that they will continue to pay the monthly fee indefinitely. Indeed, detainees regularly end up paying total amounts to LBN that exceed or approximate the amount of the bond.

34.     <u>Fifth</u>, because LBN's core goal is to affix ankle shackles at exorbitant prices, LBN has a concerted corporate practice of preventing the use of collateral instead of an ankle shackle to "securitize" the bond, while actively discouraging detainees from exploring the use of collateral with other companies.

35.     The language from its website indicates this effort even goes so far as to exploit detainees' understanding of the term "collateral":

> "The GPS program at Libre is about providing a critical service to our clients, the securitization of their immigration bond so that they can be released from immigration custody. Libre by Nexus guarantees the immigration bond, and uses the GPS to secure the bond. This means that Libre clients are not required to **pay collateral** or post property to be released.
>
> There are many horror stories about families struggling to pay collateral for immigration bonds. **We've met families who have been forced to sell everything that they have to pay collateral for a family member.** We've seen families forced to go into their communities to beg people for the use of their property as collateral…Libre by Nexus represents the hope that this may never have to happen again. We are constantly innovating our services to help more detainees in crisis. We are here to help you. Contact us today!

36.     One does not "sell" to make collateral; one puts up collateral without disposing of it. Despite LBN's scare tactics, families are not forced to "sell everything" to put up collateral on immigration bonds when they use other companies.

37.   <u>Sixth</u>, LBN fails to inform detainees of a crucial fact: by arranging for the posting of a bond, LBN ensures detainees will be moved from ICE's "detained" docket to ICE's "non-detained" docket. The latter docket moves much more slowly, meaning that detainees will often remain obligated to pay LBN's monthly fees for *years on end*—a fact never disclosed by LBN.

38.   Compounding this omission is another crucial one: LBN never informs people of the *total amount* consumers are likely to end up paying in non-refundable fees. After one year on a $10,000 bond, consumers will have paid LBN nearly $9,000 in nonrefundable fees. After two years, that amount rises to $13,000 in nonrefundable payments.

39.   Indeed, after just one year and five months, consumers on a $10,000 bond will have paid LBN the full value of the bond—in which case LBN bears no risk of flight or forfeiture. Yet, LBN still keeps collecting the obscene monthly fee.

40.   <u>Seventh</u>, after sign-up, LBN engages in aggressive debt collection practices to ensure that detainees continue to pay the exorbitant monthly fee. For example, LBN falsely tells detainees that they will be placed back in ICE custody if they fail to pay the $420 monthly fee.

41.   <u>Eighth</u>, even within the confines of the unconscionable "bargain," LBN adds even more fees. For example, it automatically charges consumers a 50 cent-per-day "insurance" fee for the ankle shackle, but never discloses that fact in Spanish and does not receive affirmative consent for charging that fee.

42.   <u>Ninth</u>, LBN conceals the burdensome nature of the ankle monitors. Its poor Spanish translation for the device – "pulsera" – indicates that it will be lightweight and non-intrusive. In reality, the ankle monitor is a heavy shackle that causes bruising when it is hauled by the wearer and forces the migrant to be tethered to a wall electrical outlet for hours each day for charging, none of which is disclosed at signup. The forced hauling and charging of the monitor is labor performed as a condition of the bond, or debt servitude.

**MARKETING**

43.   LBN is engaged in systematic, saturation-level marketing efforts in the immigrant community.

44.     LBN consistently touts itself as an organization with the best interests of immigrants in mind—a supposedly neutral advisor to get immigrants out of detention.

45.     According to its website: "If your loved one is in immigration detention, you need help right away. Libre by Nexus is here to help. We will listen to you and we care about you and your family. Our goal is to get your loved one released from jail as quickly as possible. In most cases, we can have your loved one out the same or next day."

**THE SIGN UP PROCESS**

46.     LBN targets families of detainees, providing partial and untrue representations about its "service," largely via verbal representations made in Spanish by its employees.

47.     LBN then introduces written disclosures very late in the process, and those disclosures are almost entirely in English.

48.     Those disclosures directly conflict with representations given to detainees and their families prior to provision of written disclosures.

49.     Misrepresentations and omissions made by LBN representatives to Plaintiffs are detailed in the Plaintiffs' factual section below.

**THE ONLY SPANISH LANGUAGE DOCUMENT PROVIDED BY LBN MISREPRESENTS THE TRUE NATURE OF THE "LEASE AGREEMENT," THE MONTHLY RENTAL CHARGES, AND THE MONTHLY INSURANCE CHARGES**

50.     The only document provided in Spanish is a one-page document providing certain summary disclosures and requiring initials from the detainee.

51.     That document never states that detainees will be charged $420 a month in tracker rental fees—much less that they will be charged such fees indefinitely.

52.     That document never states that detainees will be charged 50 cents per day to insure those trackers.

53.     Instead, the one-page Spanish language contract disclosure makes at least four misleading and incomplete representations in check box form—all of which are misleading.

54.     LBN states that it "will post the bond, and will pay the bail premium to a licensed bail bond company after deducting applicable fees, including collateral processing fees." This indicates

to reasonable consumers that they will <u>not</u> be liable for further charges by LBN, but rather that LBN will compensate itself out of the "bail premium" paid by detainees.

55.     Next, LBN misrepresents the consequences of a "fail[ure] to meet program conditions" by stating that "I may be remanded to the custody of the jurisdiction wherein I face charges in the above referenced case." But that is not true either: LBN has no power to order detention or invoke any ICE powers.

56.     LBN also conceals the burdensome nature of the ankle monitors. The poor Spanish translation for the device – "pulsera" – indicates that it will be lightweight and non-intrusive. The ankle monitor, however, is a heavy shackle that causes bruising when it is hauled by the wearer and forces the migrant to be tethered to a wall electrical outlet for hours each day for charging, none of which is disclosed at signup.

57.     Reasonable consumers like Plaintiffs, who could only understand the Spanish-language disclosures provided by LBN, simply did not understand at the time of sign up that they would be required to pay $420 every month, indefinitely, and be forced to haul and charge an ankle shackle monitor, every day, indefinitely.

### LBN REQUIRES UNCOMPREHENDING CONSUMERS TO SIGN AN ENGLISH-LANGUAGE CONTRACT OF ADHESION

58.     LBN then foists upon uncomprehending detainees a much longer English language document entitled "Libre by Nexus Respondent Contact—Conditions of Monitoring" and "Lease Agreement." LBN is aware that the vast majority of its customers, including Plaintiffs, do not and cannot understand this English-language document.

59.     For the first and only time, LBN discloses in the lease document that a "condition of participation" in the "program" referenced in the Spanish-language disclosure is a $420 monthly "program participant fee." LBN later specifies in the lease document that the $420 monthly fee is "for the GPS bracelet."

60.     LBN also for the first and only time states in the lease document that "GPS DEVICE REQUIRED UNTIL CASE IS COMPLETE OR COLLATERAL PAID".

61.     The clause's reference to paying "collateral" fosters the understanding, for reasonable consumers, that any monthly fees are going to "pay down" the amount of the bond. That is not true.

62.     The very structure of the "lease" is deceptive. It is structured as a tripartite document—between LBN, the detainee (or "Leasee") and "Agency." As a matter of course, LBN does not fill in the name of the "Agency." Consumers reasonably understand it means ICE. But ICE has no involvement whatsoever in the lease agreement.

63.     LBN implies ICE involvement expressly in the lease when it states that "Lessee has voluntarily undertaken to use the Equipment in order to…avoid incarceration by Agency."

64.     The contract repeatedly refers to the "agency" throughout the agreement, again falsely implying ICE involvement.

65.     According to the lease, the "tracking device" is charged at $14 per day.

66.     In addition, "insurance" is charged at 50 cents per day "with a deductible in the event of loss @$50." Upon information and belief, LBN as a matter of corporate policy prechecks the "insurance" option and does not allow consumers to rent a device without purchasing insurance.

67.     Putting aside the specific provisions of the lease agreement, its fundamental premise is a sham. Lessees are not in actuality paying $420 a month for rental of an ankle bracelet. Rather, they are paying (excessively) for LBN to indemnify their immigration bail bond, which is provided by a third party. But LBN never informs consumers that this is the true nature of the monthly fee.

68.     LBN is a bond broker much more than it is a lessor of GPS trackers. That means the $420 monthly "GPS tracker" fee does not primarily compensate LBN for use of the GPS tracker itself. Rather, the fees represent a hidden indemnification fee that LBN charges for indemnifying immigration bail bonds it procures from third parties.

69.     Indeed, the GPS trackers cost LBN nowhere near $14 per day. According to public filings in litigation against Nexus in the Northern District of Georgia, LBN pays no more than $3.00 per day, and $450 per tracker, to the supplier of its GPS ankle bracelets.

70.     Yet it charges consumers $14 per day for those same bracelets, and nearly $4,000 for their replacement.

71.     That is because a massive portion of the GPS rental fee is meant to excessively compensate LBN for its role, as a middleman, in indemnifying the immigration bonds it arranges for with third parties. Again, LBN never once informs detainees that the "lease" fee is actually for this purpose.

72.     A second document, entitled "GPS Monitoring Disclosure Statements," also provided only in English, exclusively governs the privacy concerns regarding the tracker.

73.     The Monitoring Disclosure Statements contains an arbitration provision, written entirely in English, which states that transactions that "arise out of or relate to this Agreement" shall be resolved by arbitration. Plaintiff's claims do no arise out of or relate to claims regarding the tracking of their location or similar matters and thus do not "arise out of" that agreement—but rather arise out of the Lease Agreement and marketing practices. Plaintiff does not allege breaches of, or misrepresentations in, the Monitoring Disclosure Statement.

**THE TRACKERS DO NOT PERFORM AS INTENDED AND SEVERELY LIMIT DAILY ACTIVITY OF WEARERS**

74.     The "product" LBN is offering for lease fails to perform its intended task. In fact, the burdensome and intrusive act of perpetually hauling and charging the ankle shackle inverts the transaction: it is the detainee who is performing a service to LBN, rather than LBN giving a product to the detainee.

75.     LBN never discloses the debilitating nature of the ankle shackle monitor and breaches even the English warranties contained in the lease agreement that the GPS tracker will perform properly.

76.     According to *LBN's own statements* in prior litigation against Omnilink, the supplier of its GPS trackers, Case No. 1:15-cv-03181-CC (N.D. Ga.):

77.     Its "hardware and software systems suffered from serious design flaws and other defects that caused **extensive failure rates**, which in turn resulted in significant economic harm to Plaintiff's customers, **unnecessary disruptions to the lives of individuals who wore Plaintiff's equipment[.]**" Answer, p. 2.

78.     "At certain points in time between June 2014 and August 2015 Libre experienced a **product defect rate** for Omnilink-supplied equipment and software **in excess of 50%."** *Id.*, 29.

79.     "Moreover, the failure of the power cords meant that individuals who were required to wear and recharge the power cords were **left 'tethered' to charging stations for hours a time**, which was disruptive to their daily lives." *Id.*, 31-32.

80.     LBN had experienced massive software and firmware and product defects and failures such as inoperative charging devices, software that would drop (and not reset) signals between cell towers, and other flaws that would make the electronic tracking service unavailable for large numbers of individuals. *Id.*, 39.

81.     A substantial percentage of the equipment provided by the supplier failed to function in conformity with the terms of the Lease Agreement. *Id.*, 31.

82.     A substantial percentage of the power cords provided by the supplier failed to properly charge their accompanied electronic monitoring devices, leaving those devices inoperable and Services incapable of providing geophysical monitoring for the impacted end user. Moreover, the failure of the power cords meant that individuals who were required to wear and recharge the power cords were left "tethered" to charging stations for hours a time, which was disruptive to their daily lives. *Id.*

83.     Even if the financial facets of the "program" had been disclosed properly and fairly to detainees (they were not), reasonable consumers would not have entered into any contract with LBN if they had known the true nature of the faulty ankle monitors, including its persistent intrusion on daily life.

## LBN DOES NOT RECEIVED INFORMED CONSENT TO CHARGE "INSURANCE" FEES

84.     Upon information and belief, LBN automatically charges consumers an "insurance" fee for the GPS ankle shackle, but never discloses that fact in Spanish and does not receive affirmative consent for charging that fee.

85.     Upon information and belief, LBN uniformly prechecks an "insurance" option and does not allow consumers to rent a device without purchasing insurance.

**Plaintiff Vasquez's Experience**

86.     Plaintiff Vasquez is an asylum-seeker who fled his native Honduras because he was a target of gang violence.

87.     In December 2015, he came to the United States and was placed in detention in Houston, Texas.

88.     An Immigration Judge set Mr. Vasquez's bond at $10,000.

89.     Early last year, while in detention, he heard from other detainees that LBN could assist him in posting bond, and one other detainee gave him a phone number to contact LBN by Nexus.

90.     Plaintiff Vasquez gave the information to his wife, who communicated with LBN while Plaintiff was detained.

91.     While in detention, Plaintiff Vasquez's impression was that he would pay some money upfront to LBN, LBN would pay the bond, and that he would owe LBN that money on the bond. Plaintiff Vasquez understood that there would be a monthly payment but believed it would pay down the bond. Plaintiff was never informed that a third party was posting his bond.

92.     Immediately after his release, an LBN representative met with Plaintiff Vasquez and gave him a contract to sign. This contract is attached hereto as Exhibit A. It is entirely in English even though Plaintiff Vasquez is not proficient in written or spoken English. The Libre representative verbally explained some portions of the contract in Spanish, including that he owed Libre the $8,000 remaining on the $10,000 bond (of which Plaintiff Vasquez had paid $2,000 upfront) and that Plaintiff Vasquez would have to wear an ankle bracelet at all times. The representative also said that Plaintiff Vasquez could not disturb or remove the ankle monitor because doing so would be a crime and he would be incarcerated for doing so. He was also told that any damage to the monitor would result in a $3,000 fine.

93.     Due to such misrepresentations, Plaintiff Vasquez believed that LBN was affiliated

with United States' Immigration Customs Enforcement ("ICE").

94.     Plaintiff Vasquez agreed to what he believed to be the agreement with LBN in part because he believed it was his only option for release from detention.

95.     Plaintiff was not informed that he would need to pay $420 per month in perpetuity; that LBN was charging these monies to compensate itself for indemnifying his bond with a third party; that he would be moved from the detained to the non-detained docket, meaning he could be required to pay LBN for years; that the tracker was poorly designed and would force him to stay tethered to a wall for hours a day; that the device becomes extremely hot when charging; and that the tracker was intrusive and bulky.

96.     After he signed the agreement, LBN brought out the ankle shackle monitor, which was much bulkier than Plaintiff Vasquez was led to believe, and affixed the monitor to his leg.

97.     LBN also failed to disclose to Plaintiff Vasquez that the monitor would be as intrusive as it was. The device must be charged for two hours every day, otherwise it will start vibrating intensely. It is charged by a charger connected to a wall outlet, which means that Plaintiff Vasquez is tethered to the wall for two hours a day. After minutes of charging, the device becomes very hot, preventing Plaintiff Vasquez from sleeping while the device charges. An LBN representative told him that he should not sleep while the device is charging because it could catch fire.

98.     Hauling the ankle monitor has significantly impeded Plaintiff Vasquez's work as a day laborer. It has caused Plaintiff Vasquez severe leg pain, prevented him from carrying out some tasks like climbing a ladder, and caused him to trip and fall when he was doing yard work. When Plaintiff Vasquez complained to LBN about the physical pain the ankle monitor was causing him, LBN responded that there was nothing it could do and that he should see a doctor. Plaintiff Vasquez has not sought medical attention because of the financial cost it would entail.

99.     The financial burden of payments to LBN has been crushing for Plaintiff Vasquez. In addition to the $2,000 he paid up front, he has paid about $2,000 in monthly "rental" fees, and will pay much more since his immigration case is not set to be heard until the end of 2017.

100.    To pay the monthly fees to LBN, Plaintiff must remit a substantial portion of his modest wages as a day laborer. In addition to his work as a day laborer, Plaintiff Vasquez does miscellaneous side jobs – like collecting cans for recycling – to earn enough money to pay LBN.

101.    Even though Plaintiff has kept up with his monthly rental fees, he received a call a few months ago from an LBN representative saying that he had missed two payments and could be incarcerated as a result. Plaintiff kept his financial records of payment, though, and showed that he had, in fact, made all of his required payments to LBN. LBN eventually agreed. Nevertheless, the nature of the call further solidified in Plaintiff's mind that he needed to keep up with payments otherwise he would be sent to jail or back to Honduras.

102.    Plaintiff would not have entered into the lease agreement if terms had been disclosed accurately and truthfully.

103.    Plaintiff would not have entered into the lease agreement if he knew the intrusive and burdensome nature of the ankle monitor.

104.    Plaintiff did not receive any payment for maintaining, charging and hauling his ankle monitor for LBN's benefit and under threat of detention by LBN.

105.    Plaintiff's and class members' reliance on LBN's false and misleading representations and omissions in the Spanish-language document and in verbal representations was reasonable.

### Plaintiff Ortiz's Experience

106.    Plaintiff Ortiz is an asylum-seeker who fled her native Honduras because she was a target of gang violence and gang-affiliated sexual assault.

107.    In April 2015, she came to the United States and was placed in detention in Houston, Texas.

108.    An Immigration Judge set Ms. Ortiz's bond for $20,000.

109.    In 2015, while in detention, she heard from other detainees that LBN could assist her in posting bond. One other detainee's family had seen commercials on television and gave Plaintiff Ortiz LBN's telephone number.

110.    Plaintiff Ortiz gave the information to her husband who communicated with LBN while she was in detention.

111.    While in detention, Plaintiff Ortiz's understanding, based on LBN's representations, was that LBN would pay the $20,000 on the bond, and that she would owe LBN that money, which she believed was being loaned by LBN. She was never informed a third party was posting her bond. In addition, she understood would need to pay $5,000 upfront, plus pay a monthly fee of $420 and that she would need to wear an ankle monitor at all times. She believed the monthly fee would go toward paying down the bond.

112.    Immediately after her release, an LBN representative picked Plaintiff Ortiz up from the detention facility, took her to an office and gave her a contract to sign. This contract is attached hereto as Exhibit B. It is almost entirely in English, with just one page of limited disclosures in Spanish, even though Plaintiff Ortiz is not proficient in written or spoken English. The LBN representative verbally explained some portions of the contract in Spanish, including that she owed LBN the $15,000 remaining on the bond and that Plaintiff Ortiz would have to wear an ankle bracelet at all times. She was also led to believe that she could not disturb or remove the ankle monitor because doing so would be a crime and she would be detained, incarcerated or deported.

113.    LBN also took several "mugshot" like photos of Ms. Ortiz, leading her to believe that ICE or the police would come after her if she did anything wrong to the device or failed to keep up on payments.

114.    Plaintiff Ortiz believed that LBN was affiliated with United States' Immigration Customs Enforcement ("ICE").

115.    Plaintiff Ortiz agreed to what she believed to be the agreement with LBN in part because she believed it was her only option for release from detention.

116.    Plaintiff was not informed that she would need to pay $420 per month in perpetuity; that LBN was charging these monies to compensate itself for indemnifying her bond with a third party; that she would be moved from the detained to the non-detained docket, meaning she could be required to pay LBN for years; that the tracker was poorly designed and would force her to stay

**CLASS ACTION COMPLAINT**

tethered to a wall for hours a day; that the device becomes extremely hot when charging; and that the tracker was intrusive and bulky.

117.   After she signed the agreement, LBN brought out the ankle shackle monitor, which was much bulkier than Plaintiff Ortiz was led to believe, and affixed the monitor to her leg.

118.   LBN failed to disclose to Plaintiff Ortiz that the monitor would be as intrusive as it was. Originally, Plaintiff Ortiz had a monitor that would die very quickly after charging, requiring her to charge the device for hours every day. LBN would frequently call her to let her know that her device was not charged and needed to be.

119.   Eventually, LBN gave her a new monitor, which was still burdensome, albeit less so. She still must charge the monitor for two hours every day, otherwise it will start vibrating intensely. It is charged by a charger connected to a wall outlet, which means that Plaintiff Ortiz is tethered to the wall for two hours a day. After minutes of charging, the device becomes very hot, preventing Plaintiff Ortiz from sleeping while the device charges. The tethering is especially burdensome because Plaintiff is pregnant, a concern that she has expressed to LBN, but that has not been addressed.

120.   Hauling the ankle monitor has also significantly impeded Plaintiff Ortiz's day-to-day life in other ways. It has, for example, caused bruising.

121.   The financial burden of payments to LBN by Nexus has been crushing for Plaintiff Ortiz and her family. In addition to the $5,000 she paid up front, she has paid about $7,140 in monthly "rental" fees, and will pay much more since her immigration case is not set to be heard until the end of this year.

122.   To pay the monthly fees to LBN, Plaintiff must remit a substantial portion of her husband's modest wages. Their family has undergone substantial hardship from keeping up with the payments. For example, Ms. Perdomo Ortiz and her husband have had to forgo buying groceries in order to make her monthly payment to LBN.

123.   Even though Plaintiff has kept up with her monthly rental fees, she has received calls from a LBN representative saying that she had missed payments and could be incarcerated as a

1   result. The nature of the calls further solidified in Plaintiff's mind that she needed to keep up with

2   payments otherwise she would be sent to jail, detention or back to Honduras.

3       124.    Plaintiff would not have entered into the lease agreement if terms had been disclosed

4   accurately and truthfully.

5       125.    Plaintiff would not have entered into the lease agreement if she knew the intrusive

6   and burdensome nature of the ankle monitor.

7       126.    Plaintiff did not receive any payment for maintaining, charging and hauling her ankle

8   monitor for LBN's benefit and under threat of detention by LBN.

9       127.    Plaintiff's and class members' reliance on LBN's false and misleading

10  representations and omissions in the Spanish-language document and in verbal representations was

11  reasonable.

12                              **CLASS ALLEGATIONS**

13      128.    Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set

14  forth herein.

15      129.    Plaintiffs bring this action on behalf of themselves and the members of the proposed

16  National Class and California Subclass. The proposed National Class consists of:

17
18          All individuals residing in the United States who, within the applicable
            statute of limitations preceding the filing of this action and going forward
19          from the date of this Complaint, paid monies to LBN and wore a GPS tracker
            provided by LBN.

20
21      130.    The proposed California Subclass consists of:

22          All individuals residing in the State of California who, within the applicable
            statute of limitations preceding the filing of this action and going forward
23          from the date of this Complaint, paid monies to LBN and wore a GPS tracker
            provided by LBN.

24
25      131.    Excluded from the Class and Subclass are LBN, its parents, subsidiaries, affiliates,

26  officers and directors, any entity in which LBN has a controlling interest, all customers who make a

27  timely election to be excluded, governmental entities, and all judges and their staff assigned to hear

28

1  any aspect of this litigation, as well as their immediate family members.

2      132.    The members of the Class and Subclass are so numerous that joinder is impractical.

3  The Class and Subclass consist of thousands of members, the precise number of which is within the

4  knowledge of and can be ascertained only by resort to LBN's records.

5      133.    There are numerous questions of law and fact common to the Class and Subclass

6  which predominate over any questions affecting only individual members of the Class and Subclass.

7  Among the questions of law and fact common to the Subclass are:

8              (a) Whether LBN engaged in unfair, unlawful and/or fraudulent business practices under

9                  California law;

10             (b) Whether LBN misrepresented and/or failed to disclose material facts.

11             (c) Whether LBN made false or misleading statements of fact;

12             (d) Whether LBN's conduct, as alleged herein, was intentional and knowing;

13             (e) Whether Class members are entitled to damages and/or restitution, and in what

14                  amount;

15             (f) Whether an injunction is necessary; and

16             (g) Whether Plaintiff and Class members are entitled to an award of reasonable attorneys'

17                  fees, pre-judgment interest, and costs of suit.

18  Among the questions of law and fact common to the Class are:

19             (a) Whether LBN held Class Members in a condition of peonage in violation of 18

20                  U.S.C. § 1581;

21             (b) Whether LBN forced Class Members to labor in violation of 18 U.S.C. §1589;

22             (c) Whether Class Members are entitled to damages and in what amount;

23             (d) Whether an injunction is necessary; and

24             (e) Whether Plaintiffs and Class members are entitled to an award of reasonable

25                  attorneys' fees, pre-judgment interest, and costs of suit.

26     134.    Plaintiffs' claims are typical of the claims of the members of the Class and Subclass.

27  Plaintiffs have no interests antagonistic to the interests of any other member of the Class and

28

1   Subclass.

2       135.    Plaintiffs are adequate representatives who will fully and adequately assert and

3   protect the interests of the Class and Subclass, and have retained counsel experienced in prosecuting

4   class actions.

5       136.    A class action is superior to all other available methods for the fair and efficient

6   adjudication of this lawsuit, because individual litigation of the claims of all members of the Class

7   and Subclass is economically unfeasible and procedurally impracticable. While the aggregate

8   damages sustained by the Class and Subclass are in the millions of dollars, the individual damages

9   incurred by each member of the Class and Subclass resulting from LBN's wrongful conduct are too

10  small to warrant the expense of individual lawsuits. The likelihood of individual Class and Subclass

11  members prosecuting their own separate claims is remote, and, even if every member of the Class

12  and Subclass could afford individual litigation, the court system would be unduly burdened by

13  individual litigation of such cases.

14      137.    The prosecution of separate actions by members of the Class and Subclass would

15  create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for LBN.

16  For example, one court might enjoin LBN from performing the challenged acts alleged herein,

17  whereas another might not. Additionally, individual actions may be dispositive of the interests of the

18  Class and Subclass, although certain class members are not parties to such actions.

19      138.    LBN's alleged misconduct is generally applicable to the Class and Subclass as a

20  whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class and Subclass as a

21  whole. As such, the systematic policies and practices of LBN make declaratory relief with respect to

22  the National Class and California Subclass as a whole appropriate.

### COUNT I
**(Violation of the "Unfair" Prong of the UCL,
California Business & Professions Code §§ 17200, *et seq.*)
(California Subclass Only)**

26      139.    Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set

forth herein.

28      140.    The UCL defines unfair business competition to include any "unlawful, unfair or

**CLASS ACTION COMPLAINT**

fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

141.    A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

142.    LBN has violated the "unfair" prong of the UCL through its acts and omissions detailed herein, including the imposition of an exploitative English-language agreement onto non-English speakers, who are required to pay exorbitant fees and haul GPS ankle monitors over a number of years under the threat of detention.

143.    The acts and practices alleged herein are unfair because they caused Plaintiff, and reasonable consumers like them, to incur substantial financial loss.

144.    The gravity of the harm to members of the Class resulting from these unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of LBN for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, LBN engages in unfair business practices within the meaning of California Business & Professions Code §§ 17200, *et seq.*

145.    Through its unfair acts and practices, LBN has improperly obtained money from Plaintiffs and the Class. As such, Plaintiffs request that this court cause LBN to restore this money to Plaintiffs and all Class members, and to enjoin LBN from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiffs and the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**COUNT II**
**(Violation of the "Fraudulent" Prong of the UCL,**
**California Business & Professions Code §§ 17200, *et seq.*)**
**(California Subclass Only)**

146.    Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set forth herein.

147.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal.

1   Bus. & Prof. Code § 17200.

2       148.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive

3   members of the consuming public.

4       149.    LBN deceived consumers into believing, *inter alia*, that LBN was their only option to

5   leave detention, that the financial terms were manageable, that LBC was connected to and could

6   invoke the powers of a U.S. government agency, and that wearing an LBN ankle "bracelet" would

7   not be onerous. LBN's acts and practices as described herein have deceived Plaintiffs and were

8   highly likely to deceive members of the consuming public. Accordingly, Plaintiffs suffered monetary

9   loss as a direct result of LBN's practices described herein.

10      150.    As a result of the conduct described above, LBN has been unjustly enriched at the

11  expense of Plaintiffs and members of the proposed Class. Specifically, LBN has been unjustly

12  enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false,

13  misleading and deceptive conduct.

14      151.    Through its unfair acts and practices, LBN has improperly obtained money from

15  Plaintiffs and the Class. As such, Plaintiffs request that this court cause LBN to restore this money to

16  Plaintiffs and all Class members, and to enjoin LBN from continuing to violate the UCL as

17  discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiffs and the Class

18  may be irreparably harmed and/or denied an effective and complete remedy if such an order is not

19  granted.

20                                    **COUNT III**
                        **(Violation of the "Unlawful" Prong of the UCL,**
21            **California Business & Professions Code §§ 17200, *et seq*.)**
                              **(California Subclass Only)**
22
23      152.    Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set

    forth herein.
24
        153.    The UCL defines unfair business competition to include any "unlawful, unfair or
25
    fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal.
26
    Bus. & Prof. Code § 17200.
27
        154.    A business act or practice is "unlawful" under the UCL if it violates any other law or
28

regulation.

155.    California Civil Code § 1770(a)(9) prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised."

156.    As a result of the conduct described above, LBN has been unjustly enriched at the expense of Plaintiff and members of the proposed Class. Specifically, LBN has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading and deceptive conduct.

157.    Through its unlawful acts and practices, LBN has improperly obtained money from Plaintiffs and the Class. As such, Plaintiffs request that this court cause LBN to restore this money to Plaintiffs and all Class members, and to enjoin LBN from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiffs and the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**COUNT IV**
**(Violation of the Consumers Legal Remedies Act,**
**California Civil Code §§ 1750, *et seq.*)**
**(California Subclass Only)**

158.    Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set forth herein.

159.    This cause of action is brought pursuant to the CLRA.

160.    Plaintiffs and each member of the proposed class are "consumers" within the meaning of California Civil Code § 1761(d).

161.    LBN's selling of LBN Outlet Products to Plaintiffs and the Class were "transactions" within the meaning of California Civil Code § 1761(e). The LBN services purchased by Plaintiffs and the Class are "goods" within the meaning of Civil Code §1761(a).

162.    As described herein, LBN violated Civil Code § 1770(a)(8), by "[a]dvertising goods or services with intent not to sell them as advertised."

163.    Plaintiffs relied on LBN's false representations in deciding to purchase LBN services. Plaintiffs would not have purchased LBN services or would have paid less for them absent LBN's

**CLASS ACTION COMPLAINT**

unlawful conduct.

164.   Plaintiffs request this Court enjoin LBN from continuing to violate the CLRA as alleged herein in the future and to order restitution to Plaintiffs and each member of the proposed class. Otherwise, Plaintiffs, the Class and members of the general public may be irreparably harmed and/or denied effective and complete remedy if such an order is not granted.

**COUNT V**
**(Violation of the California Translation Act,**
**California Civil Code § 1632)**
**(California Subclass Only)**

165.   Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set forth herein.

166.   This cause of action is brought pursuant to California Civil Code § 1632, the California Translation Act.

167.   LBN is engaged in a trade or business and orally negotiated primarily in Spanish in the course of entering into rental contracts with Plaintiffs and Class members.

168.   For the rental contracts, LBN failed to translate every term and condition in those contracts. LBN deliberately and selectively translated certain terms into Spanish to mislead consumers such as Plaintiffs and Class members into believing they were receiving a materially better deal than they ultimately did.

169.   Plaintiffs' and Class members' reliance on LBN's false and misleading representations and omissions in the Spanish language document and in verbal representations was reasonable.

**COUNT VI**
**(Violation of the Prohibition on Peonage,**
**18 U.S.C. § 1581)**
**(National Class)**

170.   Plaintiffs incorporate and reallege by reference each and every preceding paragraph as if fully set forth herein.

171.   This cause of action is brought pursuant to 18 U.S.C. § 1581, the Federal Prohibition on Peonage.

**CLASS ACTION COMPLAINT**

172.   LBN holds vulnerable and indigent Spanish-speaking immigrant detainees, including Plaintiffs, in a condition of peonage. LBN lures detainees into hauling ankle shackle monitors, which are heavy and prone to cause injuries including sharp pain and bruises, and charging the devices while tethered to an electronic outlet for hours at a time.

173.   The detainees are compelled to provide the labor or service of hauling and charging the devices as a condition of debts brokered by LBN.

174.   The detainees are victims authorized to bring a civil action against LBN since it is the perpetrator of a violation of the Peonage statute or knowingly benefitted from participation in a venture in violation of the Peonage statute. 18 U.S.C. § 1595.

<u>COUNT VII</u>
**(Violation of the Prohibition on Forced Labor,
18 U.S.C. § 1589)
(National Class)**

175.   Plaintiffs incorporate and reallege by reference each and every preceding paragraph as if fully set forth herein.

176.   This cause of action is brought pursuant to 18 U.S.C. § 1589, the Federal Prohibition on Forced Labor.

177.   LBN "knowingly obtained the labor or services" of vulnerable and indigent Spanish-speaking immigrant detainees, including Plaintiffs. LBN lures the detainees into hauling ankle shackle monitors, which are heavy and prone to cause injuries including sharp pain and bruises, and charging the devices while tethered to an electronic outlet for hours at a time.

178.   LBN obtained this labor or service from the detainees to secure loans from bail-bondsmen that it would use to, on the one hand, pay the detainee's bond, while, on the other hand, extract exorbitant sums from detainees that far exceed the original bond by charging them to rent and insure the devices.

179.   LBN obtained the labor or service from the detainees by means of threats of physical restraint, the abuse or threatened abuse of law or legal process, and by scheme to cause the detainees to believe that, if they did not perform such labor or services, the detainees would suffer physical restraint. LBN told the detainees or otherwise led them to believe that if they did not provide the

**CLASS ACTION COMPLAINT**

labor or service of hauling and charging the ankle shackle monitors they would be returned to detention.

180.   The detainees are victims authorized to bring a civil action against LBN since it is the perpetrator of a violation of the Forced Labor statute or knowingly benefitted from participation in a venture in violation of the Forced Labor statute. 18 U.S.C. § 1595.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Juan Quintanilla Vasquez and Gabriela Perdomo Ortiz, and the members of the Class, demand a jury trial on all claims so triable and judgment against Defendants, as follows:

A.      An order certifying that this action may be maintained as a class action, that Plaintiffs be appointed Class Representative and Plaintiffs' counsel be appointed Class Counsel;

B.      A judgment awarding Plaintiffs and all members of the Class restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that LBN obtained from Plaintiffs and the Class as a result of its unlawful, unfair and fraudulent business practices described herein;

C.      An order enjoining LBN from continuing to violate the UCL, CLRA, California Translation Act, Prohibition on Peonage, and Prohibition on Forced Labor, as described herein;

D.      A judgment awarding actual and punitive damages to Plaintiffs and the Class in an amount to be determined at trial;

E.      A judgment awarding Plaintiffs costs of their suit; including reasonable attorneys' fees pursuant to California Civil Code § 1780(d), Code of Civil Procedure § 1021.5 and as otherwise permitted by statute; and pre and post-judgment interest; and

F.      Such other and further relief as may be deemed necessary or appropriate.

## JURY TRIAL DEMANDED

PLAINTIFFS demand a jury trial on all triable issues.

1

2   Dated: February 15, 2017                     Respectfully Submitted,

3                                          By: */s/ Jeffrey Kaliel*
                                               JEFFREY KALIEL, CA Bar No. 238293
4                                              **TYCKO & ZAVAREEI LLP**
                                               483 Ninth Street, Suite 200
5                                              Oakland, CA 94607
                                               Telephone (510) 254-6808
6                                              Facsimile (202) 973-0950
                                               *jkaliel@tzlegal.com*
7

8                                              PAUL CHAVEZ, CA Bar No. 241576
                                               JESSE NEWMARK, CA Bar No. 247488
9                                              AIDIN CASTILLO, CA Bar No. 280262
                                               **CENTRO LEGAL DE LA RAZA**
10                                             3400 E. 12th Street,
                                               Oakland, CA 94601
11                                             Telephone (510) 437-1554
                                               *pchavez@centrolegal.org*
12                                             *jessenewmark@centrolegal.org*
                                               *acastillo@centrolegal.org*
13

14                                             NICHOLAS A. MIGLIACCIO, *pro hac vice* forthcoming
                                               JASON S. RATHOD, *pro hac vice* forthcoming
15                                             **MIGLICACCIO & RATHOD LLP**
                                               412 H St NE, Suite 302
16                                             Washington DC 20002
                                               Telephone (202) 470-3520
17                                             *nmigliaccio@classlawdc.com*
                                               *jrathod@classlawdc.com*

18                                             *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**