JEFFREY KALIEL, California Bar No. 238293
ANNICK M. PERSINGER, California Bar No. 272996
**TYCKO & ZAVAREEI LLP**
483 Ninth Street, Suite 200
Oakland, CA 94607
Telephone (510) 254-6808
Facsimile (202) 973-0950
*jkaliel@tzlegal.com*
*apersinger@tzlegal.com*

*Attorney for Plaintiffs*
*Additional Attorneys on Signature Page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN QUINTANILLA VASQUEZ, GABRIELA PERDOMO ORTIZ, and VICTOR HUGO CATALAN MOLIN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>LIBRE BY NEXUS, INC. and JOHN DOES 1-50,<br><br>Defendants. | Case No. 3:17-cv-755-CW<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>1. Violation of the "Unfair" Prong of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.<br>2. Violation of the "Fraudulent" Prong of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.<br>3. Violation of the "Unlawful" Prong of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.<br>4. Violation of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.<br>5. Violation of the California Translation Act, Cal. Civ. Code § 1632<br>6. Violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq.<br>7. Violation of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788, et seq. |

Plaintiffs Juan Quintanilla Vasquez, Gabriela Perdomo Ortiz and Victor Hugo Catalan Molina ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to allegations regarding Plaintiffs and on information and belief as to other allegations:

## INTRODUCTION

1.     This is a civil class action seeking monetary damages, restitution, injunctive and declaratory relief from Defendants Libre by Nexus ("LBN") and John Does 1-50 (collectively, "Defendants"), arising from their exploitation of Spanish-speaking migrant detainees with so-called "lease agreements" for GPS trackers.

2.     U.S. Immigration and Customs Enforcement ("ICE") detains thousands of undocumented immigrants each year. Once in detention, detainees who are deemed to not pose a flight risk or a threat to public safety are afforded the opportunity to post bond. Bond is typically set at an amount that well exceeds the detainees' ability to pay, forcing them to obtain third-party financing or remain in detention.

3.     Some bond financing companies in the marketplace offer reasonable options in light of credit risk. But LBN preys on detainees' vulnerability and limited understanding of English to foist crushing financial terms and GPS shackles on detainees in exchange for its "service" of arranging for a third party to post detainees' bonds. Contrary to its marketing representations, LBN is not in the business of helping as a neutral advisor for families who would like to get a loved one out of immigration detention. Rather, LBN is in the business of leasing GPS trackers under false pretenses. Indeed, contrary to Cal. Ins. Code Section 1800, LBN does not even hold a bail license and thus is not permitted to solicit or negotiate undertakings of bail in California.

4.     Detainees' lack of knowledge about immigration bail bond offerings and limited English-language ability are the bedrock of LBN's business. Using targeted English-language misrepresentations and omissions, LBN appends GPS monitors onto the bodies of detainees, and levies exorbitant fees—nearly $10,000 in the first year alone—for doing so. LBN forces detainees to sign an unconscionable English-language GPS ankle bracelet "lease" agreement on its customers while providing a Spanish disclosure that never tells the true costs of the supposed "bargain."

5. The process by which detainees enter into supposed lease agreements, and append GPS trackers to their bodies, is rife with misrepresentations. Specifically, LBN misrepresents the *amount* of fees detainees will be liable to pay LBN. And LBN misrepresents the *nature* of those fees in numerous ways, as discussed herein.

6. Through its false and deceptive advertising and pricing scheme, LBN violated (and continues to violate) California law prohibiting misleading sales practices. Specifically, LBN violated (and continues to violate) California's Unfair Competition and False Advertising Laws, *Business & Professions Code* §§ 17200 and §§ 17500, *et seq.* (the "UCL"), and the California Consumers' Legal Remedies Act, *California Civil Code* §§ 1750, *et seq.* (the "CLRA").

7. From its use of an English-language rental agreement with only selective Spanish-language disclosures, LBN violated the California Translation Act, *California Civil Code* § 1632.

8. Indeed, according to the Washington Post, LBN's CEO Michael Donovan admits that LBN did not even attempt to implement a policy requiring its employees to provide Spanish-language documents at all to Spanish-speaking consumers until very recently.

9. Plaintiffs, individually and on behalf of all others similarly situated, seek declaratory relief, damages, restitution, and other equitable remedies, including an injunction under the UCL, FAL and CLRA.

10. Plaintiffs, individually and on behalf of all others similarly situated, seek compensatory damages, liquidated damages, punitive damages, declaratory relief, and other equitable remedies, including an injunction.

## PARTIES

11. Plaintiff Juan Quintanilla Vasquez is an individual who resides in the city of Oakland, California. In reliance on LBN's false and deceptive advertising, marketing, and pricing schemes, Mr. Vasquez paid LBN for rental of a GPS ankle monitor, beginning on April 1, 2016. As detailed herein, Plaintiff was damaged as a result thereof.

12. Plaintiff Gabriela Jamileth Perdomo Ortiz is an individual who resides in the city of Oakland, California. In reliance on LBN's false and deceptive advertising, marketing, and pricing

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

1   schemes, Ms. Ortiz paid LBN for rental of a GPS ankle monitor, beginning on August 1, 2015. As

2   detailed herein, Plaintiff was damaged as a result thereof.

3        13.    Plaintiff Victor Hugo Catalan Molina is an individual who resides in the city of

4   Oakland, California.  In reliance on LBN's false and deceptive advertising, marketing, and pricing

5   schemes, Mr. Catalan Molina paid LBN for rental of a GPS ankle monitor, beginning on April 1,

6   2016. As detailed herein, Plaintiff was damaged as a result thereof.

7        14.    Defendant LBN is a corporation duly organized and existing under the laws of the

8   State of Virginia, with its principal place of business at 113 Mill Place Parkway, Suite 103, Verona,

9   Virginia 24482.

10                      **JURISDICTION AND VENUE**

11        15.    This Court has original jurisdiction of this action under the Class Action Fairness Act

12   of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the

13   aggregate claims of the members of the putative Class exceed $5 million, exclusive of costs, and at

14   least two members of the proposed Class are citizens of a different state than LBN.

15        16.    The Northern District of California has personal jurisdiction over LBN because LBN

16   is licensed and doing business in Alameda County, California, and has sufficient minimum contacts

17   with California, having intentionally availed itself of the California market so as to render the

18   exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and

19   substantial justice.

20        17.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391,

21   because Plaintiffs are residents of Alameda County, California; Defendant LBN operates an office

22   location in or near Alameda County, California; and because the events giving rise to the claims

23   occurred in significant part in Alameda County, California.

24                      **FACTUAL ALLEGATIONS**

25        18.    According to its website LBN is part of Nexus Services, organized and existing under

26   the laws of Virginia, with its principal place of business at 113 Mill Place Parkway, Suite 103,

27   Verona, Virginia 24482. Upon information and belief, Nexus Services is engaged in the business of,

28

among other things, providing electronic monitoring services in connection with immigrant bond securitization.

19.    The company has undergone massive growth since 2013, and now has at least 26 offices nationwide, including six in California.

20.    According to its website, "When you secure an immigration bond through Libre, you pay a premium payment to the bond company, which is based upon the total amount of the bond. Libre by Nexus is required to charge this fee and it is the fee of the bond company. Libre by Nexus does not keep any of that money. Libre by Nexus also charges a service fee and a GPS installation and tracking fee. Normally the total amount paid is roughly 20% of the bond. You are not required to pay collateral when using the GPS bracelet!"

21.    LBN thus represents that its fees represent payments for the provision of the GPS tracker. That is false.

## LBN MISREPRESENTS ITS PURPORTED SERVICES

22.    During the Class Period (defined below), LBN marketed its services to detainees in the custody of ICE for whom a bond—usually in amounts between $10,000 and $20,000—has been set. For detainees who cannot post that cash up front, LBN arranges for bail bonds through third parties. It purports to "securitize" those bonds via placement of GPS ankle monitors on immigration detainees, which purportedly keep detainees from fleeing.

23.    Immigration bail bonds without GPS tracking are readily available in the marketplace for immigration detainees unable to pay the full amount of the bond in cash while their case is pending in immigration court. Typically, the cost for such bonds is between 10%-20%, and usually requires additional collateral (in the form of real estate or personal property) as a security. Typically, the 10%-20% up-front fee is the only *non-refundable* payment to an immigration bail bond company.

24.    LBN, on the other hand, charges a bond security payment of 20%—at the highest end of the going rate in the industry—*plus* demands additional nonrefundable payments of $880 up front

and then $420 a month in perpetuity. To illustrate the unconscionable nature of these charges: on a $10,000 bond, a consumer will pay to LBN approximately $9,000, *nonrefundable*, in the first year.

25.     Through the use of aggressive and deceptive sales practices, LBN is able to affix a GPS ankle monitoring device on the detainees, which they must wear at all times, and charge them the unconscionable and debilitating price of $420 a month, plus an $880 activation fee, to "lease" the device.

26.     All in all, this is a shockingly bad deal, even relative to the other bad options available to immigrant detainees, and is unconscionable on its face. Moreover, LBN is only able to foist this one-sided deal on consumers because it engages in a systematic campaign of misrepresentation and omission with its indigent, Spanish-speaking clientele, who are under the duress of detention. Indeed, LBN's customers overwhelmingly possess limited or no ability to communicate in, or read, English. Yet virtually all "contract" documents provided by LBN are solely in English. The only document that was provided to Plaintiffs in Spanish is a client information sheet that contains five summarized points – none of which list the exorbitant "rental payment[s] for the GPS device." The Lease Agreement at issue is not translated.  As discussed *supra*, LBN's CEO Michael Donovan admits that LBN did not even attempt to implement a policy requiring its employees to provide Spanish-language documents to Spanish-speaking consumers until very recently.

27.     The detainees enter into the "bargain" only because LBN's misrepresentations and omissions leave them with little idea as to the reality and implications of the lease agreement. For example, LBN *never once* informs its consumers in the Spanish-language documents provided that they will be liable for a $420 monthly fee after making initial payment of the 20% and activation fee, much less *indefinitely*, and much less that the fee is not being used to pay down the debt of the bond.

28.     Rather than communicating the purported benefits and risks of its "services" in a clear, straightforward, and comprehensible fashion, LBN makes numerous misrepresentations and material omissions during the high-pressure ankle monitor bracelet sign-up process.

29.   <u>First</u>, written materials provided to detainees and their families are almost exclusively in English, despite LBN's knowledge that virtually none of the detainees they target are able to understand and read English. To wit, LBN asks detainees to sign a lengthy and dense "lease" agreement, almost all in English. The only information provided in Spanish is a one-page "key facts" document, which actually *conceals* the most material facts about the nature of the accompanying agreement.

30.   <u>Second</u>, LBN misleadingly creates the impression that LBN it has power to order the detention of immigrants.  LBN's misrepresentations are strikingly effective: "In interviews with The Washington Post, a dozen of Libre's clients said they…feared if they didn't [pay the monthly fee they would be detained again… Most said Libre employees threatened them with exactly that."

31.   <u>But LBN's sole "threat" to get consumers to continue paying the monthly fees is based on a lie.</u>  In fact, according to the Washington Post, LBN's CEO admits that "Libre has never returned anyone to Immigration and Customs Enforcement for failing to pay."  That admission is not because LBN has decided not to do so; it is because LBN has absolutely no power to do so.

32.   <u>Third</u>, LBN misrepresents the financial implications of the arrangement. It never discloses in writing in Spanish that detainees will be required to pay $420 a month in perpetuity. Moreover, LBN leads detainees to believe that the exorbitant monthly payments made to "lease" are actually payment for their outstanding bond amount. In reality, the crippling $420 fee in no way reduces the bond amount the migrant detainees owe.

33.   <u>Fourth</u>, LBN charges an initial fee for affixing and activating the GPS monitor, plus $420 a month. LBN fails to inform detainees that they will continue to pay the monthly fee indefinitely. Indeed, detainees regularly end up paying total amounts to LBN that exceed or approximate the amount of the bond.

34.   <u>Fifth</u>, because LBN's core goal is to affix GPS monitors at exorbitant prices, LBN has a concerted corporate practice of preventing the use of collateral instead of the GPS monitors to "securitize" the bond, while actively discouraging detainees from exploring the use of collateral with other companies.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

35. The language from its website indicates this effort even goes so far as to exploit detainees' understanding of the term "collateral":

> "The GPS program at Libre is about providing a critical service to our clients, the securitization of their immigration bond so that they can be released from immigration custody. Libre by Nexus guarantees the immigration bond, and uses the GPS to secure the bond. This means that Libre clients are not required to **pay collateral** or post property to be released.

> There are many horror stories about families struggling to pay collateral for immigration bonds. **We've met families who have been forced to sell everything that they have to pay collateral for a family member.** We've seen families forced to go into their communities to beg people for the use of their property as collateral…Libre by Nexus represents the hope that this may never have to happen again. We are constantly innovating our services to help more detainees in crisis. We are here to help you. Contact us today!

36. One does not "sell" to make collateral; one puts up collateral without disposing of it. Despite LBN's scare tactics, families are not forced to "sell everything" to put up collateral on immigration bonds when they use other companies.

37. <u>Sixth</u>, LBN fails to inform detainees of a crucial fact: by arranging for the posting of a bond, LBN ensures detainees will be moved from ICE's "detained" docket to ICE's "non-detained" docket. The latter docket moves much more slowly, meaning that detainees will often remain obligated to pay LBN's monthly fees for *years on end*—a fact never disclosed by LBN.

38. Compounding this omission is another crucial one: LBN never informs people of the *total amount* consumers are likely to end up paying in non-refundable fees. After one year on a $10,000 bond, consumers will have paid LBN nearly $9,000 in nonrefundable fees. After two years, that amount rises to $13,000 in nonrefundable payments.

39. Indeed, after just one year and five months, consumers on a $10,000 bond will have paid LBN the full value of the bond—in which case LBN bears no risk of flight or forfeiture. Yet, LBN still keeps collecting the obscene monthly fee.

40. <u>Seventh</u>, after sign-up, LBN engages in aggressive debt collection practices to ensure that detainees continue to pay the exorbitant monthly fee. For example, LBN falsely tells detainees that they will be placed back in custody if they fail to pay the $420 monthly fee.

41.     <u>Eighth</u>, even within the confines of the unconscionable "bargain," LBN adds even more fees. For example, it automatically charges consumers a 50 cent-per-day "insurance" fee for the GPS monitor, but never discloses that fact in Spanish and does not receive affirmative consent for charging that fee.

**MARKETING**

42.     LBN is engaged in systematic, saturation-level marketing efforts in the immigrant community.

43.     LBN consistently touts itself as an organization with the best interests of immigrants in mind—a supposedly neutral advisor to get immigrants out of detention.

44.     According to its website: "If your loved one is in immigration detention, you need help right away. Libre by Nexus is here to help. We will listen to you and we care about you and your family. Our goal is to get your loved one released from jail as quickly as possible. In most cases, we can have your loved one out the same or next day."

**THE SIGN UP PROCESS**

45.     LBN targets families of detainees, providing partial and untrue representations about its "service," largely via verbal representations made in Spanish by its employees.

46.     LBN then introduces written disclosures very late in the process, and those disclosures are almost entirely in English.

47.     Those disclosures directly conflict with representations given to detainees and their families prior to provision of written disclosures.

48.     Misrepresentations and omissions made by LBN representatives to Plaintiffs are detailed in the Plaintiffs' factual section below.

**THE ONLY SPANISH LANGUAGE DOCUMENT PROVIDED BY LBN MISREPRESENTS THE TRUE NATURE OF THE "LEASE AGREEMENT," THE MONTHLY RENTAL CHARGES, AND THE MONTHLY INSURANCE CHARGES**

49.     The only document provided in Spanish is a one-page document providing certain summary disclosures and requiring initials from the detainee.

**8**

50.     That document never states that detainees will be charged $420 a month in tracker rental fees—much less that they will be charged such fees indefinitely.

51.     That document never states that detainees will be charged 50 cents per day to insure those trackers.

52.     Instead, the one-page Spanish language contract disclosure, which is also provided in English, makes at least four misleading and incomplete representations in check box form—all of which are misleading.

53.     LBN states that it "will post the bond, and will pay the bail premium to a licensed bail bond company after deducting applicable fees, including collateral processing fees." This indicates to reasonable consumers that they will <u>not</u> be liable for further charges by LBN, but rather that LBN will compensate itself out of the "bail premium" paid by detainees.

54.     Reasonable consumers like Plaintiffs, who could only understand the Spanish-language disclosures provided by LBN, simply did not understand at the time of sign up that they would be required to pay $420 every month, indefinitely.

55.     Next, in a "Conditions of Monitoring" contract connected to the Lease Agreement, provided in English, LBN misrepresents the consequences of a "fail[ure] to meet program conditions" by stating that "I may be remanded to the custody of the jurisdiction wherein I face charges in the above referenced case." But that is not true either: LBN has no power to order detention .

56.     Even reasonable consumers who can understand the English language disclosures were similarly misled by LBN's representations that it will post a bond, which also suggests to English speakers that LBN will compensate itself out of the "bail premium" paid by detainees, and by LBN's claim that they could be returned to detention for failure to comply with lease terms.

### <u>LBN REQUIRES UNCOMPREHENDING CONSUMERS TO SIGN AN ENGLISH-LANGUAGE CONTRACT OF ADHESION</u>

57.     LBN then foists upon uncomprehending detainees a much longer English language document entitled "Libre by Nexus Respondent Contact—Conditions of Monitoring" and "Lease

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

Agreement." LBN is aware that the vast majority of its customers, including Plaintiffs, do not and cannot understand this English-language document.

58.     For the first and only time, LBN discloses in the lease document that a "condition of participation" in the "program" referenced in the Spanish-language disclosure is a $420 monthly "program participant fee." LBN later specifies in the lease document that the $420 monthly fee is "for the GPS bracelet."

59.     LBN also for the first and only time states in the lease document that "GPS DEVICE REQUIRED UNTIL CASE IS COMPLETE OR COLLATERAL PAID".

60.     The clause's reference to paying "collateral" fosters the understanding, for reasonable consumers, that any monthly fees are going to "pay down" the amount of the bond. That is not true.

61.     The very structure of the "lease" is deceptive. It is structured as a tripartite document—between LBN, the detainee (or "Leasee") and "Agency." As a matter of course, LBN does not fill in the name of the "Agency" to lead consumers to believe that they could be detained for breach of the lease agreement.

62.     According to the lease, the "tracking device" is charged at $14 per day.

63.     In addition, "insurance" is charged at 50 cents per day "with a deductible in the event of loss @$50." Upon information and belief, LBN as a matter of corporate policy prechecks the "insurance" option and does not allow consumers to rent a device without purchasing insurance.

64.     Putting aside the specific provisions of the lease agreement, its fundamental premise is a sham. Lessees are not in actuality paying $420 a month for rental of an ankle bracelet. Rather, they are paying (excessively) for LBN to indemnify their immigration bail bond, which is provided by a third party. But LBN never informs consumers that this is the true nature of the monthly fee.

65.     LBN is a bond broker much more than it is a lessor of GPS trackers. That means the $420 monthly "GPS tracker" fee does not primarily compensate LBN for use of the GPS tracker itself. Rather, the fees represent a hidden indemnification fee that LBN charges for indemnifying immigration bail bonds it procures from third parties.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

66.     Indeed, the GPS trackers cost LBN nowhere near $14 per day. According to public filings in litigation against Nexus in the Northern District of Georgia, LBN pays no more than $3.00 per day, and $450 per tracker, to the supplier of its GPS ankle bracelets.

67.     Yet it charges consumers $14 per day for those same bracelets, and nearly $4,000 for their replacement.

68.     That is because a massive portion of the GPS rental fee is meant to excessively compensate LBN for its role, as a middleman, in indemnifying the immigration bonds it arranges for with third parties. Again, LBN never once informs detainees that the "lease" fee is actually for this purpose.

## LBN DOES NOT RECEIVED INFORMED CONSENT TO CHARGE "INSURANCE" FEES

69.     Upon information and belief, LBN automatically charges consumers an "insurance" fee for the GPS ankle shackle, but never discloses that fact in Spanish and does not receive affirmative consent for charging that fee.

70.     Upon information and belief, LBN uniformly prechecks an "insurance" option and does not allow consumers to rent a device without purchasing insurance.

### Plaintiff Vasquez's Experience

71.     Plaintiff Vasquez is an asylum-seeker who fled his native Honduras because he was a target of gang violence.

72.     In December 2015, he came to the United States and was placed in detention in Houston, Texas.

73.     An Immigration Judge set Mr. Vasquez's bond at $10,000.

74.     Early last year, while in detention, he heard from other detainees that LBN could assist him in posting bond, and one other detainee gave him a phone number to contact LBN.

75.     Plaintiff Vasquez gave the information to his wife, who communicated with LBN while Plaintiff was detained.

76.     An LBN representative told Plaintiff Vasquez's wife, who communicated with LBN on behalf of him while he was detained, that if Plaintiff Vasquez could pay some money upfront to

LBN, LBN would pay the bond, and that he would owe LBN that money on the bond. LBN never disclosed that a third party was posting the bond. In addition, LBN conveyed that Plaintiff Vasquez would have a monthly payment to make, and led his wife to believe that the monthly payment would go toward paying down the bond. Plaintiff Vasquez's wife conveyed all of this to Plaintiff Vasquez who agreed to proceed with LBN's deal in reliance on the omissions and misrepresentations of material terms it made to his wife.

77.     LBN knowingly misrepresented the terms of the deal and later provided written disclosures – almost entirely in English – that obfuscated the truth and did not accurately portray the risks and benefits of the lease agreement.

78.     Immediately after his release, an LBN representative met with Plaintiff Vasquez and gave him a contract to sign. This contract is attached hereto as Exhibit A. It is entirely in English even though Plaintiff Vasquez is not proficient in written or spoken English. The Libre representative verbally explained some portions of the contract in Spanish, including that he owed Libre the $8,000 remaining on the $10,000 bond (of which Plaintiff Vasquez had paid $2,000 upfront) and that Plaintiff Vasquez would have to wear an ankle bracelet at all times. The representative also said that Plaintiff Vasquez could not disturb or remove the ankle monitor because doing so would be a crime and he would be incarcerated for doing so. He was also told that any damage to the monitor would result in a $3,000 fine.

79.     Due to such misrepresentations, Plaintiff Vasquez believed that LBN could cause him return to be returned to detention.

80.     Plaintiff Vasquez was fearful of remaining detained indefinitely, and LBN's misrepresentations and omissions induced him to enter into the agreement.

Plaintiff was not informed that he would need to pay $420 per month in perpetuity; that LBN was charging these monies to compensate itself for indemnifying his bond with a third party; that he would be moved from the detained to the non-detained docket, meaning he could be required to pay LBN for years.

81.     The financial burden of payments to LBN has been crushing for Plaintiff Vasquez. In

**12**

addition to the $2,000 he paid up front, he has paid over $3,000 in monthly "rental" fees, and will pay much more since his immigration case is not set to be heard until the end of 2017.

82.     To pay the monthly fees to LBN, Plaintiff must remit a substantial portion of his modest wages as a day laborer. In addition to his work as a day laborer, Plaintiff Vasquez does miscellaneous side jobs – like collecting cans for recycling – to earn enough money to pay LBN.

83.     Even though Plaintiff has kept up with his monthly rental fees, he received a call a few months ago from an LBN representative saying that he had missed two payments and could be incarcerated as a result. Plaintiff kept his financial records of payment, though, and showed that he had, in fact, made all of his required payments to LBN. LBN eventually agreed. Nevertheless, the nature of the call further solidified in Plaintiff's mind that he needed to keep up with payments otherwise he would be sent to jail or back to Honduras.

84.     Plaintiff would not have entered into the lease agreement if terms had been disclosed accurately and truthfully.

85.     Plaintiff would not have entered into the lease agreement if he knew the intrusive and burdensome nature of the Lease Agreement.

86.     Plaintiff's and class members' reliance on LBN's false and misleading representations and omissions in the Spanish-language document and in verbal representations was reasonable.

87.     Plaintiff is a monolingual Spanish speaker.

### Plaintiff Ortiz's Experience

88.     Plaintiff Ortiz is an asylum-seeker who fled her native Honduras because she was a target of gang violence and gang-affiliated sexual assault.

89.     In April 2015, she came to the United States and was placed in detention in Houston, Texas.

90.     An Immigration Judge set Ms. Ortiz's bond for $20,000.

91.     In 2015, while in detention, she heard from other detainees that LBN could assist her in posting bond. One other detainee's family had seen commercials on television and gave Plaintiff

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

1  Ortiz LBN's telephone number.

2      92.    Plaintiff Ortiz gave the information to her husband who communicated with LBN

3  while she was in detention.

4      93.    An LBN representative told Plaintiff Ortiz's husband, who communicated with LBN

5  on behalf of her while she was detained, that if Plaintiff Ortiz could pay some money upfront to

6  LBN, LBN would pay the bond, and that she would owe LBN that money on the bond. LBN never

7  disclosed that a third party was posting the bond. In addition, LBN conveyed that Plaintiff Ortiz

8  would have a monthly payment to make, and led her husband to believe that the monthly payment

9  would go toward paying down the bond. Plaintiff Ortiz's husband conveyed all of this to Plaintiff

10  Ortiz who agreed to proceed with LBN's deal in reliance on the omissions and misrepresentations of

11  material terms it made to her husband.

12      94.    LBN knowingly misrepresented the terms of the deal and later provided written

13  disclosures – almost entirely in English – that obfuscated the truth and did not accurately portray the

14  risks and benefits of the lease agreement.

15      95.    Immediately after her release, an LBN representative picked Plaintiff Ortiz up from

16  the detention facility, took her to an office and gave her a contract to sign. This contract is attached

17  hereto as Exhibit B. It is almost entirely in English, with just one page of limited disclosures in

18  Spanish, even though Plaintiff Ortiz is not proficient in written or spoken English. The LBN

19  representative verbally explained some portions of the contract in Spanish, including that she owed

20  LBN the $15,000 remaining on the bond and that Plaintiff Ortiz would have to wear an ankle

21  bracelet at all times. She was also led to believe that she could not disturb or remove the ankle

22  monitor because doing so would be a crime and she would be detained, incarcerated or deported.

23      96.    LBN also took several "mugshot" like photos of Ms. Ortiz, leading her to believe that

24  ICE or the police would come after her if she did anything wrong to the device or failed to keep up

25  on payments.

26      97.    Plaintiff Ortiz believed that LBN could cause her to be returned to detention.

27      98.    Plaintiff Ortiz was fearful of remaining detained indefinitely, and LBN's

28

misrepresentations and omissions induced her to enter into the agreement.

99.    Plaintiff was not informed that she would need to pay $420 per month in perpetuity; that LBN was charging these monies to compensate itself for indemnifying her bond with a third party; that she would be moved from the detained to the non-detained docket, meaning she could be required to pay LBN for years.

100.    The financial burden of payments to LBN by Nexus has been crushing for Plaintiff Ortiz and her family. In addition to the $5,000 she paid up front, she has paid about $7,140 in monthly "rental" fees, and will pay much more since her immigration case is not set to be heard until the end of this year.

101.    To pay the monthly fees to LBN, Plaintiff must remit a substantial portion of her husband's modest wages. Their family has undergone substantial hardship from keeping up with the payments. For example, Ms. Ortiz and her husband have had to forgo buying groceries in order to make her monthly payment to LBN.

102.    Even though Plaintiff has kept up with her monthly rental fees, she has received calls from a LBN representative saying that she had missed payments and could be incarcerated as a result. The nature of the calls further solidified in Plaintiff's mind that she needed to keep up with payments otherwise she would be sent to jail, detention or back to Honduras.

103.    Plaintiff would not have entered into the lease agreement if terms had been disclosed accurately and truthfully.

104.    Plaintiff's and class members' reliance on LBN's false and misleading representations and omissions in the Spanish-language document and in verbal representations was reasonable.

105.    Plaintiff is a monolingual Spanish speaker.

**Plaintiff Catalan Molina's Experience**

106.    Plaintiff Catalan Molina is an asylum seeker who fled his native Mexico because he and his family were the targets of cartel violence due, in part, to Mr. Molina's involvement as the head of a taxi cooperative.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

107.    In December 2015, he came to the United States and was placed in detention in San Diego, California.

108.    An Immigration Judge set Mr. Catalan Molina's bond for $10,000.

109.    In early 2016, while in detention, another detainee told him that LBN could assist him in posting bond, and gave him LBN's telephone number. That individual received referral fees for referring detainees to LBN.

110.    Plaintiff Catalan Molina gave the information to his wife who, along with his wife's sister, communicated with LBN while he was in detention. An LBN representative told Plaintiff's wife that if Plaintiff could pay some money upfront to LBN, LBN would pay the bond, and that he would owe LBN that money on the bond. LBN never disclosed that a third party was posting the bond. In addition, LBN conveyed that Plaintiff would have a monthly payment to make, and led his wife to believe that the monthly payment would go toward paying down the bond. Plaintiff's wife conveyed all of this to Plaintiff who agreed to proceed with LBN's deal in reliance on the omissions and misrepresentations of material terms it made to his wife.

111.    LBN knowingly misrepresented the terms of the deal and later provided written disclosures – almost entirely in English – that obfuscated the truth and did not accurately portray the risks and benefits of the lease agreement.

112.    Immediately after his release, an LBN representative picked Plaintiff Catalan Molina up from the detention facility, took him to an office and gave him a contract to sign. This contract is attached hereto as Exhibit C. It is almost entirely in English, with just one page of limited disclosures in Spanish, even though Plaintiff Catalan Molina is not proficient in written or spoken English. The LBN representative verbally explained some portions of the contract in Spanish, including that Plaintiff Catalan Molina would have to wear an ankle bracelet at all times. He was also led to believe that he could not disturb or remove the ankle monitor because doing so would be a crime and he would be detained or incarcerated.

113.    Due to LBN's actions, Plaintiff Catalan Molina reasonably believed that LBN could cause him to be returned to detention.  The LBN representative told Plaintiff Catalan Molina that if

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

he did not make payments or otherwise comply with LBN's demands, he could be arrested or detained.

114.   Plaintiff Catalan Molina was fearful of remaining detained indefinitely, and LBN's misrepresentations and omissions induced him to enter into the agreement.

115.   Plaintiff was not informed that he would need to pay $420 per month in perpetuity; that LBN was charging these monies to compensate itself for indemnifying his bond with a third party; that he would be moved from the detained to the non-detained docket, meaning he could be required to pay LBN for years.

116.   The financial burden of payments to LBN has been crushing for Plaintiff Molina. In addition to the $3,020 he paid up front, he has paid about $5,000 in monthly "rental" fees, and will pay much more since his wife's immigration case, of which he is a derivative, is not set to be heard until the end of 2017.

117.   To pay the monthly fees to LBN, Plaintiff must remit a substantial portion of his modest wages as a day laborer. To make the payments, he and his family often have to skip eating meals and fall behind on their monthly rent.

118.   Even when Plaintiff has kept up with his monthly rental fees, he has received text messages and calls from a LBN representative saying that he had missed payments and could be incarcerated as a result. The sister-in-law who originally co-signed the agreement also receives such calls. The nature of the calls further solidified in Plaintiff's mind that he needed to keep up with payments otherwise he would be sent to jail or detention.

119.   Plaintiff would not have entered into the lease agreement if terms had been disclosed accurately and truthfully.

120.   Plaintiff would not have entered into the lease agreement if he knew the intrusive and burdensome nature of the ankle monitor.

121.   Plaintiff did not receive any payment for maintaining, charging and hauling his ankle monitor for LBN's benefit and under threat of detention by LBN.

122.   Plaintiff's and class members' reliance on LBN's false and misleading

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

1   representations and omissions in the Spanish-language document and in verbal representations was

2   reasonable.

3         123.  Plaintiff is a monolingual Spanish speaker.

                          **CLASS ALLEGATIONS**

4

5         124.  Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set

6   forth herein.

7         125.  Plaintiffs bring this action on behalf of themselves and the members of the proposed

8   National Class and California Subclass. The proposed National Class consists of:

9              All individuals residing in the United States who, within the applicable
    statute of limitations preceding the filing of this action and going forward
10             from the date of this Complaint, paid monies to LBN to lease a GPS tracker.

11        126.  The proposed California Subclass consists of:

12

13             All individuals residing in the State of California who, within the applicable
    statute of limitations preceding the filing of this action and going forward
14             from the date of this Complaint, paid monies to LBN to lease a GPS tracker.

15        127.  Excluded from the Class and Subclass are LBN, its parents, subsidiaries, affiliates,

16  officers and directors, any entity in which LBN has a controlling interest, all customers who make a

17  timely election to be excluded, governmental entities, and all judges and their staff assigned to hear

18  any aspect of this litigation, as well as their immediate family members.

19        128.  The members of the Class and Subclass are so numerous that joinder is impractical.

20  The Class and Subclass consist of thousands of members, the precise number of which is within the

21  knowledge of and can be ascertained only by resort to LBN's records.

22        129.  There are numerous questions of law and fact common to the Class and Subclass

23  which predominate over any questions affecting only individual members of the Class and Subclass.

24  Among the questions of law and fact common to the Subclass are:

25           (a) Whether LBN engaged in unfair, unlawful and/or fraudulent business practices under

26               California law;

27           (b) Whether LBN misrepresented and/or failed to disclose material facts.

28

**18**

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

(c) Whether LBN made false or misleading statements of fact;

(d) Whether LBN's conduct, as alleged herein, was intentional and knowing;

(e) Whether Class members are entitled to damages and/or restitution, and in what amount;

(f) Whether an injunction is necessary; and

(g) Whether Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of suit.

Among the questions of law and fact common to the Class are:

(a) Whether LBN violated 15 U.S.C § 1692;

(b) Whether Class Members are entitled to damages and in what amount;

(c) Whether an injunction is necessary; and

(d) Whether Plaintiffs and Class members are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of suit.

130.     Plaintiffs' claims are typical of the claims of the members of the Class and Subclass. Plaintiffs have no interests antagonistic to the interests of any other member of the Class and Subclass.

131.     Plaintiffs are adequate representatives who will fully and adequately assert and protect the interests of the Class and Subclass, and have retained counsel experienced in prosecuting class actions.

132.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class and Subclass is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class and Subclass are in the millions of dollars, the individual damages incurred by each member of the Class and Subclass resulting from LBN's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class and Subclass members prosecuting their own separate claims is remote, and, even if every member of the Class and Subclass could afford individual litigation, the court system would be unduly burdened by

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

individual litigation of such cases.

133.    The prosecution of separate actions by members of the Class and Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for LBN. For example, one court might enjoin LBN from performing the challenged acts alleged herein, whereas another might not. Additionally, individual actions may be dispositive of the interests of the Class and Subclass, although certain class members are not parties to such actions.

134.    LBN's alleged misconduct is generally applicable to the Class and Subclass as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class and Subclass as a whole. As such, the systematic policies and practices of LBN make declaratory relief with respect to the National Class and California Subclass as a whole appropriate.

### COUNT I
**(Violation of the "Unfair" Prong of the UCL,**
**California Business & Professions Code §§ 17200, *et seq*.)**
**(California Subclass Only)**

135.    Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set forth herein.

136.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

137.    A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

138.    LBN has violated the "unfair" prong of the UCL through its acts and omissions detailed herein, including the imposition of an exploitative English-language agreement onto non-English speakers, who are required to pay exorbitant fees over a number of years under the threat of detention.

139.    The acts and practices alleged herein are unfair because they caused Plaintiff, and reasonable consumers like them, to incur substantial financial loss.

140.    The gravity of the harm to members of the Class resulting from these unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of LBN for engaging in

**20**

such deceptive acts and practices. By committing the acts and practices alleged above, LBN engages in unfair business practices within the meaning of California Business & Professions Code §§ 17200, *et seq*.

141.   Through its unfair acts and practices, LBN has improperly obtained money from Plaintiffs and the Class. As such, Plaintiffs request that this court cause LBN to restore this money to Plaintiffs and all Class members, and to enjoin LBN from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiffs and the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

<u>**COUNT II**</u>
**(Violation of the "Fraudulent" Prong of the UCL,**
**California Business & Professions Code §§ 17200, *et seq*.)**
**(California Subclass Only)**

142.   Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set forth herein.

143.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

144.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

145.   LBN deceived consumers into believing, *inter alia*, that LBN was their only option to leave detention, that the financial terms were manageable, that LBN could return them to detention, and that wearing an LBN ankle "bracelet" would not be onerous. LBN's acts and practices as described herein have deceived Plaintiffs and were highly likely to deceive members of the consuming public. Accordingly, Plaintiffs suffered monetary loss as a direct result of LBN's practices described herein.

146.   As a result of the conduct described above, LBN has been unjustly enriched at the expense of Plaintiffs and members of the proposed Class. Specifically, LBN has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false,

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

misleading and deceptive conduct.

147. Through its unfair acts and practices, LBN has improperly obtained money from Plaintiffs and the Class. As such, Plaintiffs request that this court cause LBN to restore this money to Plaintiffs and all Class members, and to enjoin LBN from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiffs and the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**COUNT III**
**(Violation of the "Unlawful" Prong of the UCL,**
**California Business & Professions Code §§ 17200, *et seq*.)**
**(California Subclass Only)**

148. Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set forth herein.

149. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

150. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

151. LBN violates the unlawful prong by violating the CLRA, the California Translation Act, the FDCPA and the Rosenthal Act.

152. Additionally, LBN violates the unlawful prong by violating California Insurance Code Section 1800 which states: "An insurer shall not execute an undertaking of bail except by and through a person holding a bail license as issued as provided in this chapter. A person shall not in this state solicit or negotiate in respect to execution or delivery of an undertaking of bail or bail bond by an insurer, or execute or deliver such an undertaking of bail or bail bond unless licensed as provided in this chapter …"

    (a) LBN is not a licensed in this state to solicit or negotiate in respect to execution or delivery of an undertaking of bail or bail bond by an insurer or to execute or deliver such an undertaking of bail or bail bond;

(b) LBN solicits detainees and negotiates with them in respect to the execution or delivery of an undertaking of bail; and

(c) Plaintiffs and the classes paid leases they would not otherwise have paid because LBN held itself out as having the ability to solicit or negotiate bail even though it was not licensed;

153.    As a result of the conduct described above, LBN has been unjustly enriched at the expense of Plaintiff and members of the proposed Class. Specifically, LBN has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading and deceptive conduct.

154.    Through its unlawful acts and practices, LBN has improperly obtained money from Plaintiffs and the Class. As such, Plaintiffs request that this court cause LBN to restore this money to Plaintiffs and all Class members, and to enjoin LBN from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiffs and the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## COUNT IV
### (Violation of the Consumers Legal Remedies Act,
### California Civil Code §§ 1750, *et seq.*)
### (California Subclass Only)

155.    Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set forth herein.

156.    This cause of action is brought pursuant to the CLRA.

157.    Plaintiffs and each member of the proposed class are "consumers" within the meaning of California Civil Code § 1761(d).

158.    LBN's selling of LBN services to Plaintiffs and the Class were "transactions" within the meaning of California Civil Code § 1761(e). The LBN services purchased by Plaintiffs and the Class are "goods" within the meaning of Civil Code §1761(a).

159.    Plaintiff and the California subclass members are not sophisticated experts with independent knowledge of bail bonds, collateral, or LBN's tracking system.

23

160.    As described herein, LBN violated Civil Code § 1770(a)(8), by "[a]dvertising goods or services with intent not to sell them as advertised." Defendant knew that Plaintiffs and the California subclass members were deceived into believing that they would be "paying" down collateral, when, in fact, LBN was collecting exorbitant fees disguised as lease payments.

161.    Defendant violated California Civil Code §§ 1770(a)(5) and (a)(7) by misleading consumers to believe that they were "paying" down their collateral by making payments to LBN, when, in fact, they were not.

162.    LBN made misrepresentations in violation of §§ 1770(a)(5) and (a)(7) by representing that it would post the bond, leading detainees to believe that that LBN will compensate itself out of the "bail premium" paid by detainees.

163.    Defendant represented that LBN's services were of a particular standard or quality when Defendant was aware that they were of another in violation of § 1770(a)(7).   Defendant "Libre" (which means "free") maintained that consumers would be heavily burdened by exorbitant lease fee agreements.

164.    Plaintiffs relied on LBN's false representations in deciding to purchase LBN services. Plaintiffs would not have purchased LBN services or would have paid less for them absent LBN's unlawful conduct.

165.    Prior to the filing of this First Amended Complaint, a CLRA notice letter was served on Defendant which complies in all respects with California Civil Code § 1782(a).   A true and correct copy of Plaintiffs' letter is attached as Exhibit D.   On February 16, 2017, Plaintiffs sent Defendant a letter via certified mail, return receipt requested, advising Defendant that it is in violation of the CLRA and must correct, repair, replace, or otherwise rectify the services alleged to be in violation of § 1770.   Defendant was further advised that in the event that the relief requested had not been provided within thirty (30) days, Plaintiffs would bring an action for damages pursuant to the CLRA. On February 2, 2017, Defendant received the letter.   Defendant has not corrected its violations.   Wherefore, Plaintiffs seek damages, in addition to restitution, and injunctive relief for this violation of the CLRA.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

166.     Plaintiffs request this Court enjoin LBN from continuing to violate the CLRA as alleged herein in the future and to order restitution to Plaintiffs and each member of the proposed class. Otherwise, Plaintiffs, the Class and members of the general public may be irreparably harmed and/or denied effective and complete remedy if such an order is not granted.

**COUNT V**
**(Violation of the California Translation Act,**
**California Civil Code § 1632)**
**(California Subclass Only)**

167.     Plaintiffs incorporate and reallege each and every preceding paragraph as if fully set forth herein.

168.     This cause of action is brought pursuant to California Civil Code § 1632, the California Translation Act.

169.     LBN is engaged in a trade or business and orally negotiated primarily in Spanish in the course of entering into rental contracts with Plaintiffs and Class members.

170.  California Civil Code § 1632(b)(2) provides:

(b) Any person engaged in a trade or business who negotiates primarily in Spanish, Chinese, Tagalog, Vietnamese, or Korean, orally or in writing, in the course of entering into any of the following, shall deliver to the other party to the contract or agreement and prior to the execution thereof, a translation of the contract or agreement in the language in which the contract or agreement was negotiated, that includes a translation of every term and condition in that contract or agreement:

…

(2) A loan or extension of credit secured other than by real property, or unsecured, for use primarily for personal, family, or household purposes.

171.     LBN's Lease Agreements serve as a loan or extension of credit for the percentage of bail paid by a third-party bail bondsmen.

172.     LBN's Lease Agreements are for personal purposes of being released from detention.

173.     LBN negotiates primarily in Spanish prior to providing an untranslated "Lease Agreement" and addendum documents.

174.     For the rental contracts, or "Lease Agreement," LBN failed to translate every term and condition in those contracts. LBN deliberately and selectively translated certain terms into Spanish to mislead consumers such as Plaintiffs and Class members into believing they were

25

receiving a materially better deal than they ultimately did. For example, none of the few translated terms include the rental payment for the GPS device.

175. Plaintiffs' and Class members' reliance on LBN's false and misleading representations and omissions in the Spanish language document and in verbal representations was reasonable.

## COUNT VI
### (Violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692(p)
### (National Class)

176. Plaintiffs incorporate and reallege by reference each and every preceding paragraph as if fully set forth herein.

177. This cause of action is brought pursuant to 15 U.S.C. §§ 1692-1692(p), Fair Debt Collection Practices Act ("FDCPA").

178. LBN is a "debt collector" because, among other reasons, it "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692(a).

179. Plaintiffs and class members are "consumers" because they are natural persons who have been obligated or allegedly obligated to pay debt.

180. LBN regularly transmits oral and written communication to Plaintiffs and class members, attempting to collect debt.

181. In its communications with Plaintiffs and class members, Defendant has regularly used false, deceptive, or misleading representations or means, in violation of Section 807 of the FDCPA 15 U.S.C. § 1692(e), including but not limited to:

(a) Falsely representing or implying that it is capable of causing their return to detention, in violation of Section 807(1) of the FDCPA, 15 U.S.C. § 1692 (e)(1);

(b) Falsely representing or implying that non-payment of a debt will result in the arrest or imprisonment of a person or the seizure, garnishment, or attachment of a person's property or wages, when such action is not lawful or when Defendant has no intention of taking such action, in violation

of Section 807 (4) of the FDCPA, 15 U.S.C. § 1692e(4);

(c)     Threatening to take action that is not lawful or that Defendant does not intend to take, in violation of Section 807(5) of the FDCPA, 15 U.S.C. § 1692e(5);

(d)     Falsely representing or implying that a consumer has committed a crime or other misconduct in order to disgrace the consumer, in violation of Section 807(7) of the FDCPA, 15 U.S.C. § 1692(e)(7);

182.    As a result of each and every violation of the FDCPA, Plaintiffs and Class members, are entitled to any actual damages pursuant to U.S.C. § 1692k(a)(1); statutory damages for a knowing or willful violation in the amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1692k(a)(3) from Defendant.

## COUNT VII
### (Violation of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788-1788.32 (RFDCPA) (California Subclass Only)

183.    Plaintiffs incorporate and reallege by reference each and every preceding paragraph as if fully set forth herein.

184.    The foregoing acts and omissions constitute numerous and multiple violations of the RFDCPA.

185.    As a result of each and every violation of the RFDCPA, Plaintiffs and the California Class Members are entitled to any actual damages pursuant to Cal. Civ. Code § 1788.30(a); statutory damages for a knowing or willful violation in the amount up to $1,000.00 pursuant to Cal. Civ. Code § 1788.30(b); and reasonable attorney's fees and costs pursuant to Cal. Civ. Code § 1788.30 (c) from the Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Juan Quintanilla Vasquez, Gabriela Perdomo Ortiz, and Victor Hugo Catalan Molina, and the members of the Class, demand a jury trial on all claims so triable and judgment against Defendants, as follows:

A.      An order certifying that this action may be maintained as a class action, that Plaintiffs be appointed Class Representative and Plaintiffs' counsel be appointed Class Counsel;

27

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

1    B.    A judgment awarding Plaintiffs and all members of the Class restitution and/or other

2    equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust

3    enrichment that LBN obtained from Plaintiffs and the Class as a result of its unlawful, unfair and

4    fraudulent business practices described herein;

5    C.    An order enjoining LBN from continuing to violate the UCL, CLRA, California

6    Translation Act, FDCPA, and RFDCPA as described herein;

7    D.    A judgment awarding actual, statutory, treble, and punitive damages to Plaintiffs and

8    the Class in an amount to be determined at trial;

9    E.    A judgment awarding Plaintiffs costs of their suit; including reasonable attorneys'

10   fees pursuant to California Civil Code §§ 1780(d), Code of Civil Procedure § 1021.5 and as

11   otherwise permitted by statute; and pre and post-judgment interest; and

12   **F.**    Such other and further relief as may be deemed necessary or appropriate.

### JURY TRIAL DEMANDED

14   PLAINTIFFS demand a jury trial on all triable issues.

15

16   Dated June 9, 2017                      Respectfully Submitted,

17                                      By:  */s/ Jeffrey Kaliel*
                                             Jeffrey Kaliel
18

19                                           JEFFREY KALIEL, CA Bar No. 238293
                                             ANNICK M. PERSINGER, CA Bar No. 272996
20                                           **TYCKO & ZAVAREEI LLP**
                                             483 Ninth Street, Suite 200
21                                           Oakland, CA 94607
                                             Telephone (510) 254-6808
22                                           Facsimile (202) 973-0950
                                             jkaliel@tzlegal.com
23                                           *apersinger@tzlegal.com*

24                                           PAUL CHAVEZ, CA Bar No. 241576
                                             JESSE NEWMARK, CA Bar No. 247488
25                                           AIDIN CASTILLO, CA Bar No. 280262
                                             **CENTRO LEGAL DE LA RAZA**
26                                           3400 E. 12th Street,
                                             Oakland, CA 94601
27                                           Telephone (510) 437-1554
                                             *pchavez@centrolegal.org*
28

**28**

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW

*jessenewmark@centrolegal.org*
*acastillo@centrolegal.org*

NICHOLAS A. MIGLIACCIO, *pro hac vice* forthcoming
JASON S. RATHOD, *pro hac vice* forthcoming
**MIGLICACCIO & RATHOD LLP**
412 H St NE, Suite 302
Washington DC 20002
Telephone (202) 470-3520
*nmigliaccio@classlawdc.com*
*jrathod@classlawdc.com*

*Attorneys for Plaintiffs*

**29**

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 17-cv-00755-CW