Jesse Newmark (SBN 247488)
Aidin Castillo (SBN 280262)
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, California 94601
Telephone: (510) 437-1863
jnewmark@centrolegal.org
acastillo@centrolegal.org

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN QUINTANILLA VASQUEZ, GABRIELA PERDOMO ORTIZ, VICTOR HUGO CATALAN MOLINA, and KEVIN CALDERON, individually and on behalf of all others similarly situated, | Case No. 4:17-cv-00755-CW **DECLARATION OF GABRIELA PERDOMO ORTIZ IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES, COSTS, AND SERVICE AWARDS** |
| Plaintiffs, | Judge:  Hon. Claudia Wilken |
| v. | |
| LIBRE BY NEXUS, INC. and JOHN DOES 1-50, | |
| Defendants. | |

1. My name is Gabriela Perdomo Ortiz. I am a named Plaintiff and Class Representative in this case. I have personal knowledge of the facts set forth in this declaration and could and would testify competently to them if called upon to do so. I am providing this declaration in support of Plaintiffs' Motion for Fees, Costs, and Service Awards.

2. I came to the United States in April 2015 seeking asylum. I fled my home country of Honduras because I was the target of gang violence and sexual assault.

3. I was placed in detention in Houston, Texas, and an Immigration Judge set my bond for $20,000.

4. My husband, Kevin Calderon, and I eventually contacted Libre by Nexus (LBN), who arranged for my bond to be paid.

5. In exchange, we made payments to LBN and I had to wear an ankle monitor.

6. My husband and I believed that LBN could cause me to be sent back to immigration detention or Honduras. At one point, an LBN employee told me that I could be incarcerated if I missed my payments.

7. I paid a total of over $23,000 to LBN, including up front and monthly fees.

8. My family has a modest income and we have undergone substantial hardship paying fees to LBN and for our other expenses. For instance, we have had to forgo buying groceries at times.

9. I first spoke with my counsel about this case in January 2017. I was pregnant at the time and concerned about wearing the ankle monitor.

10. I met with Aidin Castillo, an attorney for Centro Legal, on about January 11, 2017, to discuss my situation and a potential lawsuit against LBN.

11. In January 2017, I also had multiple calls with Ms. Castillo and the other attorneys about the facts in this case, and spent time searching my records for documents. I traveled to Centro Legal's office at least one other time for a meeting and call with the other attorneys on the case.

12. In February 2017, I again met with my attorneys a number of times, to review and sign a retainer and the complaint in this case, and to share and discuss the documents I had

found.  I also had a number of phone calls with my attorneys about the facts in this case, my financial hardships, and LBN's actions.  I also reviewed my payments to LBN and sent texts and photos to my attorneys.

13. From March to June 2017, I met with my attorneys about two more times and had a number of calls with them.  I reviewed the amended complaint and the documents I was providing to LBN.  I also talked more with my attorneys about the facts in my case and payments to LBN.

14. At the end of June and in July 2017, I had phone calls and met with my attorneys to prepare for a deposition.  I then went to the deposition in San Francisco, which lasted all day.

15. In 2018 and 2019, I stayed in contact with my attorneys to answer questions about facts and get updates on the case and settlement talks.

16. In 2020, I had more phone calls with my attorneys to discuss and review the settlement and other updates.

17. During this time, I have also spent many hours talking with my husband and family and thinking about the case on my own, to prepare for meetings and the deposition.  I also made time to be available to speak with my attorneys during a number of mediations, and reviewed and corrected my deposition transcript.

18. I did all of this even though it was very difficult for me and my family, because I cared about changing the policies at LBN for others in my situation.

19. I decided to file this class action because I knew that many others were affected by the same policies, but would be too scared to come forward.  I felt a responsibility to stand up for their rights too.

20. However, I was also very frightened about proceeding.  I was pregnant at the time and had fled Honduras because of violence to seek asylum.  I had also just gotten out of immigration detention, because LBN had arranged for my bond to be paid.  I was still in immigration removal proceedings to decide my asylum claims.

21. I was particularly frightened that LBN or ICE could retaliate against me for filing this lawsuit, and put me back in detention or send me back to Honduras.  I was scared they would call immigration not only about me, but also my husband.  I felt guilty that we might both be sent back because I decided to speak up.  I remember I couldn't sleep for many nights.

22. I was also worried that LBN would put an ankle monitor back on me after I had my baby.  It took many efforts for them to remove it and only because I was pregnant.  I really didn't want to have the monitor on my leg again.  It was painful and people look at you badly on the streets, like you are a criminal.

23. My attorneys also told me that a class action could take a long time and that there was no guarantee we would win anything.  They also told me that class actions could be difficult and time-consuming and that I would have to act in the best interest of others who went through a similar process with LBN, even if it meant a greater sacrifice from me.

24. Over the last almost four years, I have been very anxious about this case and possible retaliation.

25. The deposition was especially difficult.  I was so scared and nervous, I couldn't sleep the night before.  I was asked questions about my immigration status, asylum claims, and detention, which were painful to revisit.  I also had to answer very personal questions about myself and my family, which made me feel embarrassed and scared.  The attorneys talked to me like I was the one who had made a mistake, and that felt humiliating.

26. I also had to miss work for my deposition and once my baby was born, I had to make arrangements for childcare.  As a new mother who was nursing it was really difficult for me to be away from my newborn baby.  I remember during the questioning in San Francisco, it was really hard to be away from my baby for so many hours.  It was also painful because I was nursing and although we took some time off for me to pump, it was not the same.  I remember I cried when I got back home.  I was very emotional.

27. Even though all of this happened, I trusted my attorneys in the case.  I knew what we were doing was the right thing to do.  I really wanted LBN to bring prices down.  It has

been really hard for my husband and I to make the payments, and I didn't want that to continue happening to other people.  It's really hard when you don't have support in this country, you don't know your rights and you feel afraid that you will be sent back.  It is almost paralyzing.

28. I did not expect, nor was I ever promised that I would receive a service award.  However, I believe that the proposed service award would fairly compensate me for the time, effort, and sacrifices I have made with this case.  I also understand that I have signed a release of all claims I could have against LBN, which is a bigger release than the rest of the class.

29. I am very proud of the outcome of this case because I believe it will make things better for other clients and sponsors of LBN.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct, and that this declaration was executed in Oakland, California, on September 1, 2020.


_____

GABRIELA PERDOMO ORTIZ