JANE M. AZIA, NY Bar # 1539600
Telephone: (212) 416-8727
Email: jane.azia@ag.ny.gov
LAURA J. LEVINE, NY Bar # 2337368
Telephone: (212) 416-8313
Email: laura.levine@ag.ny.gov
JOSEPH P. MUELLER, NY Bar # 5079389
Telephone: (212) 416-8321
Email: joseph.mueller@ag.ny.gov
GAVIN G. MCCABE, CA Bar # 130864
Telephone: (212) 416-8469
Email: gavin.mccabe@ag.ny.gov
     Local Counsel
Attorneys for State of New York
28 Liberty Street, 20th floor
New York, NY 10005
(212) 416-8321

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN QUINTANILLA VASQUEZ, GABRIELA PERDOMO ORTIZ, VICTOR HUGO CATALAN MOLINA, and KEVIN CALEDERON, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>LIBRE BY NEXUS, INC. and JOHN DOES 1-50,<br><br>     Defendants. | Case No. 4:17-cv-755-CW<br>_____<br><br>**BRIEF OF *AMICUS CURIAE* ATTORNEYS GENERAL OF NEW YORK, VIRGINIA AND MASSACHUSETTS IN OPPOSITION TO THE PROPOSED SETTLEMENT**<br><br>Hearing Date:  December 9, 2020<br>Time:         2:30 P.M.<br><br>Judge:        Hon. Claudia Wilken |

1

**TABLE OF CONTENTS**

2

3    TABLE OF AUTHORITIES……………………………………………………….....   ii

4    INTRODUCTION…………………………………………………………………   1

5    INTEREST OF *AMICI CURIAE*………………………………………………...   3

6    BACKGROUND………………………………………………………………....   5

7    ARGUMENT……………………………………………………………………   11

8
     I.   The Current Proposed Settlement Should Be Rejected Because It Is Not
9         Fair, Reasonable, Adequate or in the Public Interest…………………………………   11

10
          A.    The Monetary Relief to Class Members Inadequately Addresses
11              the Harm Incurred……………………………………………………   12

12        B.    The Notice Process Is Inadequate…………………………………   15

13        C.    The Release Provision is Excessively Broad……………………………   16

14        D.    The Award to Class Counsel Deserves Scrutiny…………………………   17

15   CONCLUSION………………………………………………………………..   19

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bowling v. Pfizer, Inc.*, 143 F.R.D. 141 (S.D. Ohio 1992) ............................................................11

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012)............................................................11, 18

*Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292 (S.D. Fla. 2007) ....................................5

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ...........................................................17

*Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) ...................................................................18

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) .................................................10

*In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011) ..................17

*In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013) .................................................14, 17

*International Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) ...........................................................11

*Knisley v. Network Assoc's*, 312 F.3d 1123 (9th Cir. 2002) .........................................................17

*Nazih v. Cafe Istanbul of Columbus, LLC*, 2018 WL 4334613 (S.D. Ohio Sept. 11, 2018)..........15

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) .......................................................14

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ....................................................................17

*Thompson v. Midwest Found. Indep. Physicians Ass'n*, 124 F.R.D. 154 (S.D. Ohio 1988)............5

*True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010).........................12, 17

*Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991)...........................................17

*Williams v. Vukovich,* 720 F.2d 909 (6th Cir. 1983)..............................................................11, 18

*Wilson v. DirectBuy, Inc.*, 2011 WL 2050537 (D. Conn. May 16, 2011)...................................5, 15

**Statutes and Regulations**

Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711-15 ............................................................3

28 U.S.C. § 1715(b) .................................................................................4

28 U.S.C. § 1715(b)(7)(B) .........................................................................4

Fed. R. Civ. P. 23(e)(2) ...........................................................................11

Mass. Gen. .L. c. 93A, §§ 4 and 5.............................................................4

Mass. Gen. L. c. 93A, § 6(6)..................................................................n.4

Mass. Gen. L. c 12, § 11H ........................................................................4

New York General Business Law § 350-d ................................................3

Virginia Consumer Protection Act, Va. Code §§ 59.1-196 *et seq.*..................3

**Miscellaneous Authorities**

*AG Ferguson: Immigration Bond Services Company to Provide More than
      $2.7 Million in Debt Relief Over English-Only Contracts*, Mass. Attorney
      General (Aug. 26, 2019), *https://www.atg.wa.gov/news/news-releases/
      ag-ferguson-immigration-bond-services-company-provide-more-27-
      million-debt-relief*..................................................................................n.4

Class Action Fairness Act of 2005, PL 109–2, February 18, 2005, 119 Stat 4
      (28 U.S.C.A. § 1711 Note)..................................................................5

*Consumers and Class Actions: A Retrospective and Analysis of Settlement* Campaigns,
      Federal Trade Commission (Sept. 2019),
      https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-
      retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf.........n.41

Michael E. Miller, *Va. regulators threaten to shut down company accused of preying on
      undocumented immigrants*, Washington Post (Oct. 10, 2019),
      https://www.washingtonpost.com/local/va-regulators-threaten-to-shut-down-
      company-accused-of-preying-on-undocumented-immigrants/2019/10/10/
      42f6b79e-eb94-11e9-9c6d-436a0df4f31d_story.html........................................ ..n.7

S. Rep. No. 109-14, at 29 (2005)...................................................................4

**INTRODUCTION**

Libre by Nexus, Inc. and its parent company, Nexus Services Inc. (together, "Libre"), are currently under investigation by the Attorneys General of New York, Massachusetts, and Libre's home state of Virginia (together, the "States" or "Amici"). The States are investigating Libre for taking advantage of some of these communities' most vulnerable individuals in violation of state consumer protection laws. From at least 2014 through the present, Libre has engaged in a business in which it offers to obtain bonds for detained undocumented immigrants who often cannot afford the cost of their bonds. Libre obtains these bonds in exchange for a large initial fee and a commitment to pay a series of recurring fees, most or all of which are non-refundable. The States are investigating whether Libre, over the years, has engaged in numerous deceptive, coercive, and unlawful business practices including (a) employing a coercive and deceptive enrollment process that involved misleading contracts, excessive fees, and numerous misrepresentations and omissions of material fact, (b) using English-language contracts, even though a vast majority of Libre's clientele does not speak, read, or understand English, and (c) for much of its existence and continuing for some percentage of consumers today, requiring consumers to wear a GPS tracking device that many consumers were led to believe was a government requirement of their bond, and that sometimes malfunctioned and harmed consumers. Many of these practices are allegations in this putative class action. It is against this backdrop that the terms of the proposed class action settlement agreement[1] must be evaluated.

The States urge the Court to reject the class action settlement as currently proposed. Both the Class Action Fairness Act and Federal Rule of Civil Procedure 23(e) demand careful scrutiny of all class action settlements and the invalidation of those that do not strike a fair balance between the interests of counsel and the interests of class members. The class action settlement fails to meet that standard. After

---

[1] Confidential Settlement Agreement and Release, *Vasquez v. Libre by Nexus, Inc.* (N.D. Cal. July 29, 2020), ECF No. 143-1, Ex. 1 ("Revised Settlement Agreement").

an examination of the proposed settlement and applicable law, the States recommend rejecting the current proposed settlement for several reasons.

*First*, the limited monetary benefits offered to class members raise serious concerns about the fairness of the proposed settlement, especially to the subclass of consumers who will be eligible for cash payments. Class members will release all consumer claims—including, for example, claims for personal physical injury—against Libre in return for the possibility of receiving a small monetary payment. This small payment may not be paid by Libre until 2024 if the company does not meet aggressive financial benchmarks. Given that the payment amount and delayed payment schedule are based on Libre's purported current financial condition, there is no assurance that, if Libre cannot meet its financial benchmarks for three years, it will suddenly have the resources to meet them in 2024. Thus, under the settlement, consumers may receive no restitution at all, despite being charged in some cases well over $10,000 under coercive, deceptive and unfair circumstances. Therefore, the restitution portion of the settlement provides *de minimis* value to class members, in exchange for an overly broad release of consumer claims.

*Second*, while providing very little monetary value to the individual class members whose claims it extinguishes, the proposed settlement provides considerable value to class counsel under unclear terms. Class counsel seeks $800,000 in attorney's fees—more than the $750,000 amount of cash payments that would go to the class itself. And how those fees would be paid—whether they would take priority or be subsequent to the cash payments to class members while Libre makes weekly payments to the administrator—is not clear from the settlement agreement.

*Third*, the notice provided to the class under the proposed settlement agreement is inadequate. It relies principally on text messaging and indirect publication notice, which may be treated like spam or not seen at all. The text notice will be sent only to one phone number, even though other numbers may exist. And the details of the publication notice are not clear, leaving the possibility that the notice will

2

not be published frequently enough or for a long enough period of time. The insufficient notice is of particular concern here, because the only way for many class members to obtain relief may be to submit materials to Libre—which they will only know to do if actually informed.

Accordingly, the Court should not approve the proposed settlement in its current form.

## INTEREST OF *AMICI CURIAE*

The Attorneys General of New York, Massachusetts, and Virginia, in their capacity as *amici curiae*, urge this Court to reject the current proposed class action settlement in this case.[2] The States receive notice of all proposed class action settlements under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711-15 ("CAFA"). The New York Attorney General's Bureau of Consumer Frauds and Protection, the Virginia Attorney General's Consumer Protection Section, and the Massachusetts Attorney General's Public Protection and Advocacy Bureau investigate and take enforcement action on behalf of the public interest and have relevant experience in bringing consumer harm to light and crafting appropriate remedies.

Amici have a long-standing interest in protecting the states' vulnerable consumers, such as undocumented immigrants and their friends and family members, from deceptive and unlawful practices. The New York Attorney General has taken numerous legal actions to protect undocumented immigrants.[3] The New York Attorney General has a broad range of sovereign enforcement powers, including the ability to collect restitution, disgorgement and $5,000 in penalties for each false advertisement and deceptive business practice pursuant to New York General Business Law § 350-d. The Virginia Attorney General is similarly empowered to obtain restitution, injunctive relief, and civil penalties of up to $2,500 per violation of the Virginia Consumer Protection Act, Va. Code §§ 59.1-196 *et*

---

2 The Attorneys General submit to the Court's jurisdiction only as *amici*, and the submission of this brief is without prejudice to the States' ability to enforce and investigate claims related to the issues under dispute.
3 *See, e.g.*, *Washington v. Trump*, No. 2:17-cv-00141 (W.D. Wash.) (challenging the Trump administration's travel ban); *New York v. Trump*, No. 1:17-cv-05228 (E.D.N.Y.) (challenging Trump administration's rescindment of the Deferred Action for Childhood Arrivals program, or DACA).

*seq.* And the Massachusetts's Attorney General has broad authority to enforce the Commonwealth's consumer protection and civil rights laws, including by filing civil actions to recover damages, restitution and penalties. *See, e.g.*, Mass. Gen. .L. ("M.G.L.") c. 93A, §§ 4 and 5 (Massachusetts Consumer Protection Law); M.G.L. c 12, § 11H (Massachusetts Civil Rights Law). The New York, Massachusetts, and Virginia Attorneys General have pending investigations of Libre pursuant to their state consumer protection laws for conduct related to the allegations in the Complaints in this action.[4]

A significant portion of the nationwide class members are residents of the States that join in this *amicus* brief. As reported by Defendant to the Attorneys General under the Class Action Fairness Act, 28 U.S.C. § 1715(b)(7)(B), the parties estimate that there are 46,756 nationwide class members. Of these, 6,298 are residents of the three Amici States. The Parties estimate that 2,778 class members are New York residents; 680 are Massachusetts residents; and 2,840 are Virginia residents.

The Attorneys General perform a unique role for the Court by addressing the fairness of class action settlements. This role is recognized in the Class Action Fairness Act, which requires parties to provide information to the Attorneys General about the proposed settlement before the fairness hearing. 28 U.S.C. § 1715(b). This provision "is intended to combat the 'clientless litigation' problem by adding a layer of independent oversight" and permitting Attorneys General to object to inequitable settlements. S. REP. NO. 109-14, at 29 (2005).

---

4 *See* Memorandum of Law in Opposition to Petitioners' Petition and in Support of Respondent's Cross-Motion to Dismiss the Petition and to Compel Compliance with an Investigative Subpoena, *Libre by Nexus Inc. v. Schneiderman*, No. 151982/2018 (Sup. Ct. N.Y. Cnty. Mar. 22, 2018), NYSCEF Doc. No. 14; Petition to Enforce Civil Investigative Demand, *Commonwealth of Virginia ex rel. Mark R. Herring, Attorney General v. Nexus Services, Inc.*, (Richmond Cir. Ct.) Case No. CL 18002037-00, April 18, 2018. The Washington State Office of the Attorney General also investigated Libre and entered into a settlement agreement to resolve that investigation. *See AG Ferguson: Immigration Bond Services Company to Provide More than $2.7 Million in Debt Relief Over English-Only Contracts*, Mass. Attorney General (Aug. 26, 2019), *https://www.atg.wa.gov/news/news-releases/ag-ferguson-immigration-bond-services-company-provide-more-27-million-debt-relief*. The Attorney General of Massachusetts is restricted by state law from disclosing information or material produced in response to a civil investigative demand. *See* M.G.L. c. 93A, § 6(6). While the Office confirms that it is investigating allegations that Libre By Nexus has violated the Commonwealth's consumer protection and civil rights laws (as discussed above and below), the Office cannot and does not in this brief disclose information or material produced to it pursuant to M.G.L. c 93A, § 6.

Because of this role, courts have frequently recognized that the opposition of a number of Attorneys General weighs strongly against a proposed class action settlement. *See Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1328 (S.D. Fla. 2007) (explaining that the appearance and objection of the Attorneys General as amicus curiae "distinguishes this case from other class actions" and that "[t]he vigor and substance of the objections presented counsels against a finding favorable to the parties on this [FED. R. CIV. P. 23(e)] factor"). Another decision rejecting a proposed class action settlement recognized that the *amicus* brief of the Attorneys General should be viewed as "a placeholder for many absent class members' objections." *Wilson v. DirectBuy, Inc.*, 2011 WL 2050537, at *9 (D. Conn. May 16, 2011). Other courts have also found that an Attorney General's opinion "is an important factor for the court's consideration in determining the fairness of the proposed settlement." *Thompson v. Midwest Found. Indep. Physicians Ass'n*, 124 F.R.D. 154, 161 (S.D. Ohio 1988).

The Attorneys General submit this *amicus* brief because of genuine concerns about the adequacy and fairness of the proposed settlement before the Court that involve the very problems Congress noted in adopting the Class Action Fairness Act:

> Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where—
>> (A) counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value;
>> (B) unjustified awards are made to certain plaintiffs at the expense of other class members; and
>> (C) confusing notices are published that prevent class members from being able to fully understand and effectively exercise their rights.

Class Action Fairness Act of 2005, PL 109–2, February 18, 2005, 119 Stat 4 (28 U.S.C.A. § 1711 Note).

## BACKGROUND

Libre is engaged in the business of obtaining bonds for detained immigrants who often cannot afford the immediate cost of their bonds. Libre obtains these bonds for detainees in exchange for

payment of a large initial fee as well as a commitment to pay a series of recurring fees, most or all of which are non-refundable. Libre has obtained bonds for thousands of consumers in the Amici States.

The States are investigating whether Libre has engaged in false advertising and deceptive business practices to lure consumers into its program with false promises of charitable services and affordable bonds. Such practices include Libre's use of a coercive and deceptive enrollment process with consumers, involving incredibly complex and misleading contracts, excessive fees, and numerous misrepresentations and omissions of material fact. This includes Libre having consumers execute a contract that was in English, even though a vast majority of Libre's clientele does not speak, read, or understand English. For much of its existence, Libre also required consumers to wear a GPS tracking device that many consumers were led to believe was a government requirement of their bond, that sometimes malfunctioned and physically harmed consumers, and that frequently did not work at all. Libre has represented that approximately 27% of consumers are still required to wear GPS ankle monitors.[5] Libre also failed to accurately and completely record consumers' payments, failed to timely issue required refunds to certain consumers, and used using harassing and deceptive collection practices to seek payments from consumers.

In addition to the investigations of the States, Libre is also under investigation by the Consumer Financial Protection Bureau,[6] as well as the Virginia Bureau of Insurance[7] and many other state and federal regulators.[8] Apart from governmental investigations, Libre also is engaged in lawsuits with private litigants that could result in substantial liability for the company.[9]

---

5 Revised Settlement Agreement at 16.
6 *See Consumer Financial Protection Bureau v. Nexus Services, Inc.*, No. 17-2238 (ABJ-RMM) (D.D.C.).
7 *See* Michael E. Miller, *Va. regulators threaten to shut down company accused of preying on undocumented immigrants*, WASHINGTON POST (Oct. 10, 2019), https://www.washingtonpost.com/local/va-regulators-threaten-to-shut-down-company-accused-of-preying-on-undocumented-immigrants/2019/10/10/42f6b79e-eb94-11e9-9c6d-436a0df4f31d_story.html.
8 *See* Nexus Services, Inc.'s Second Supplemental Objections and Responses to Plaintiff RLI Insurance Company's First Set of Interrogatories, at 4-5, *RLI Insurance Company v. Nexus Services, Inc.*, No. 5:18-cv-66 (W.D. Va. Aug. 21, 2020), ECF No. 496-13.
9 Order, *RLI Insurance Company v. Nexus Services, Inc.*, No. 5:18-cv-66 (W.D. Va. Nov. 29, 2018), ECF No. 139 (order granting motion for a second preliminary injunction against Nexus Services, Inc.); Verified Complaint, *Eckert Seamans*

Relevant here, the proposed class action settlement contains three principal forms of purported relief: (1) cash payments to consumers, (2) debt forgiveness to consumers, and (3) a variety of prospective relief that reforms certain of Libre's business practices.[10] The States' objection to the settlement is focused on the first two forms of relief.

*Cash payments.*

Under the proposed settlement agreement, Libre will pay only $750,000 in cash to the Settlement Administrator to distribute to two subclasses.[11] These are (1) the Former and Current Program Participants Payments Subclass and (2) the Sponsor Payments Subclass.[12] (Ineligible for cash payments is the third subclass, which consists of "all current LBN 'program participants' and 'sponsors' who paid, or caused to be paid, or caused to be paid on their behalf, a fee to LBN" unless "within six months of the Final Settlement Approval Date [they] have been issued a Form I-391."[13])

The Parties estimate that under these terms, only approximately 6,000 class members will receive cash payments, receiving an estimated pro rata amount of approximately $125 each.[14] This is out of a total settlement class of approximately 46,756 nationwide class members—meaning a mere 12.8% of the class is eligible for the small cash payment.

Under the settlement agreement, Libre will not have to make *any* of these cash payments to the Settlement Administrator until December 1, 2021 at the earliest.[15] From that point on, Libre only has to pay certain amounts to the Settlement Administrator on a weekly basis according to the following schedule:

---

*Cherin & Mellott, LLC v. Nexus Services, Inc.*, No. 3:20-cv-658 (Aug. 21, 2020), ECF No. 1 (verified complaint seeking approximately $1.43 million in unpaid legal fees and costs).

10 *See* Revised Settlement Agreement at 6 ("The monetary consideration to the Settlement Class from the Settlement Amount is comprised of two distinct parts – the 'Cash Settlement Fund' and the 'Debt Forgiveness Fund' . . . .").

11 *Id.* at 8.

12 *Id.*

13 *Id.* at 7.

14 Second Declaration of Jason S. Rathod in Support of Plaintiffs' Motion for Preliminary Approval of Settlement, at ¶ 6, *Vasquez v. Libre by Nexus*, No. 4:17-cv-755 (July 29, 2020), ECF No. 143-1 ("2d Rathod Decl.").

15 Revised Settlement Agreement at 9.

| One-Year Gross Revenues as Compared to Libre's 2019 revenues | Weekly payment owed by Libre |
|---|---|
| 75-80% [16] | $1,000 |
| 80-90% | $10,000 |
| 90-100% | $25,000 |
| 100-110% | $100,000 |

If under this schedule the full cash settlement amount is not paid by Libre by January 1, 2023, then the balance will be paid in equal monthly installments for a year beginning in January 2023. [17]

The specific date of payment by the Settlement Administrator to the class is not specified in the agreement and appears to be left to the future determination of the Parties. [18] Likewise the priority of payments—for the Cash Settlement Fund, Notice and Other Administrative Costs, Incentive Awards, and the Fee and Expense Award—to be distributed from the amounts deposited to the Settlement Administrator is not clear.

*Debt forgiveness*.

Under the proposed settlement agreement, there will be a "Debt Relief Fund" that "consists of the remainder of the Settlement Amount after payment of the Cash Settlement Fund, Notice and Other Administrative Costs, Incentive Awards, and the Fee and Expense Award." [19]

---

16 Under the Revised Settlement Agreement, it is unclear what amount Libre will owe if the revenue percentage is either 80, 90, or 100%. For example, if the revenue percentages is 80%, it could be associated with either a $1,000 or a $10,000 payment—a ten-fold difference. In addition, the agreement is silent as to what Libre will owe if it achieves over 110% revenue.
17 *Id.*
18 *Id.* at 10 ("The Settlement Administrator shall be responsible for disbursing the Cash Settlement Fund, Fee and Expense Award, and Incentive Awards from the funds that LBN places in escrow pursuant to a schedule the parties shall agree upon to minimize settlement administration and check printing and mailing expenses.").
19 *Id.* at 6.

The Settlement Amount is $3,200,000.[20] The Cash Settlement Fund is $750,000.[21] The Notice and Other Administrative costs "are all costs and expenses actually incurred by the Settlement Administrator . . . in the publication of Class Notice, providing notice as required by 28 U.S.C. § 1715(b), establishment of the Settlement Website, and the processing, handling, reviewing claims, and opt-outs, or as otherwise agreed to by the Parties and the Claims Administrator or as ordered by the Court."[22] Therefore, this cost is indeterminate but likely to be substantial. The Incentive Awards are to be determined by the Court but are capped at $40,000.[23] And Class counsel in this action is seeking a Fee and Expense Award of $800,000,[24] which is the maximum amount permitted under the proposed settlement agreement.[25]

Based on this, the Parties estimate that there will be $1.53 million remaining of the Settlement Amount available for debt relief.[26]

The Parties estimate that under these terms, "there are approximately 21,000 class members in the Current Program Participant Subclass to share in the $1.53 million in debt relief," for an average of approximately "$73 per program participant in debt reduction."[27]

In contrast to this $73 in debt relief, Libre has represented that "that it estimates a national average of approximately $12,903 owed by each program participant."[28]

---

20 *Id.* at 5.
21 *Id.* at 6.
22 Id. at 4.
23 *Id.* at 4.
24 Notice of Motion and Motion for Fees, Costs, and Service Awards; Memorandum in Support, at 7, *Vasquez v. Libre by Nexus*, No. 4:17-cv-755 (Sept. 1, 2020), ECF No. 147.
25 Revised Settlement Agreement at 3.
26 *See* 2d Rathod Decl. at ¶ 7.
27 *Id.* at ¶ 7.
28 *Id.* at ¶ 8.

The Parties identify "meaningful debt collection representations" as part of the purported relief to class members.[29] But the settlement agreement contains absolutely no obligations that would restrict Libre from engaging in debt collection activities at any point in the future.[30]

Finally, class counsel says that "[t]he amount of the common fund is particularly significant given concerns as to LBN's financial situation."[31] But Amici have serious concerns about the basis for this conclusion given the complete lack of detail and the limitation of such statement to Libre by Nexus, Inc., thereby excluding its parent, Nexus Services Inc, and its principals and affiliated entities. There is no evidence of a thorough investigation of Libre's inability to pay by reviewing reliable financial documents, including but not limited to years of audited income and cash flow statements, balance sheets and tax returns. *See Holmes v. Continental Can Co.*, 706 F.2d 1144, 1151 (11th Cir. 1983) (reversing and remanding where the district court approved the settlement distribution on the basis of a "deficient record" consisting of counsel's representations; "[i]t is wise in most cases to rely upon proven facts, particularly economic facts" (quotation marks omitted)).

*Notice to Class Members*.

Under the proposed settlement agreement, the principal form of notice given to class members is through text messages[32] sent only to "the last known telephone number" in Libre's business records.[33] The content of the text message need only (1) be "substantially similar" to the postcard notice found at Exhibit F of the settlement agreement and (2) "provide details on how to access a prerecorded message that will be in English and Spanish and that provides information to the Settlement Class on the settlement and how to access the Settlement Website."[34] If the text fails, the Settlement Administrator

---

29 Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Approval of Settlement and Approval of Notice to Class of Settlement, at 8, *Vasquez v. Libre by Nexus*, No. 4:17-cv-755 (July 29, 2020), ECF No. 143.
30 *See* Revised Settlement Agreement at 14.
31 Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Approval of Settlement and Approval of Notice to Class of Settlement, at 8, *Vasquez v. Libre by Nexus*, No. 4:17-cv-755 (July 29, 2020), ECF No. 143.
32 Revised Settlement Agreement at 19.
33 *Id.* at 18.
34 *Id.* at 19.

will try to send it two more times. If and only if the text messages fail will postcard notice be provided. The postcard notice, too, will be sent only to "the last known mailing address" in Libre's business records.

The settlement agreement would also provide for a notice to be published at least once in Spanish in three periodicals.[35] The publication notice also will be sent in English to the American Immigration Lawyers Association and the National Immigration Project of the National Lawyers Guild.[36] And the notice and other information will be put on a website.[37]

Notice of the settlement is especially important to class members, in particular those eligible for cash payments. If Libre does not have a Form I-391 for a class member in its records, the class member will not receive a pro rata share of the cash settlement fund unless the he or she affirmatively submits an I-391 to Libre.[38]

## ARGUMENT

### I. The Current Proposed Settlement Should Be Rejected Because it is Not Fair, Reasonable, Adequate or in the Public Interest

Before approving a proposed class action settlement, the Court must determine that a class action settlement is fair, reasonable, and adequate. FED. R. CIV. P. 23(e)(2); *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012); *Williams v. Vukovich,* 720 F.2d 909 (6th Cir. 1983). In evaluating whether a proposed settlement is fair, reasonable, and adequate, a court must "compare the strength of the plaintiff's case with the amount and form of relief offered by the settlement." *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 151 (S.D. Ohio 1992). Courts also consider other factors, including whether the settlement is in the public interest. *See International Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).

---

35 *Id.* at 20.
36 *Id.*
37 *Id.* at 20-21.
38 *Id.* at 21-22.

As set forth below, the proposed settlement should be rejected because it essentially provides little to no monetary value to class members who are releasing strong claims.

### A.   The Monetary Relief to Class Members Inadequately Addresses the Harm Incurred

The proposed settlement's monetary relief for class members is inadequate for a number of reasons.

*First*, only a small number of class members are even eligible for cash payments under the settlement agreement. Merely an estimated 12.8% are eligible. And of that already small group of class members, only those who have a Form I-391 (Notice of Immigration Bond Cancelled) on file, or those who submit it, will receive the cash payments, making the number of eligible class members even smaller. *See True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067 (C.D. Cal. 2010) ("Courts generally are wary of settlement agreements where some class members are treated differently than others.").

*Second*, the amount of cash payments being offered is small when compared to the harm incurred by the class. The settlement agreement would provide a mere $750,000 in cash payments. However, Libre commonly charged over $10,000 in fees to each individual consumer. There are over 46,000 class members. Even limiting the analysis to the 6,000 class members who would be eligible for cash payments, that would amount to over $60,000,000 in fees. Receiving refunds of an approximate average of $125 is far insufficient to address the harm incurred by consumers, harm which may have included bruising, discomfort and physical injury. In contrast, class counsel is seeking $800,000, which is more than would actually be paid to the class itself.

*Third*, the cash payments to class members are excessively delayed, which is cause for serious concern. Under the proposed settlement, the date that class members will receive their cash payments is indeterminate. Libre will not have to pay *any* money to the Settlement Administrator until December 1, 2021 at the earliest—nearly a full year after the final approval hearing in this Action. Even then, Libre

may pay nothing at all until January 2023 if its gross revenues are less than 75% of the previous year. And if Libre meets the lowest benchmark, Libre may only have to pay as little as $1,000 per week to the Settlement Administrator until January 1, 2023. And Libre may not be obligated to complete its payments to the Settlement Administrator until *January 2024*. Given the importance of the benchmarks to the payment schedule, it is unreasonable that the settlement agreement does not set forth how the Parties will determine whether these benchmarks will be met, what reliable materials, such as audited financial statements, will be required to make such a determination.

The Parties do not provide an adequate explanation of the circumstances necessitating this unusual and extremely unfavorable payment schedule. They rely on threadbare claims of Libre's financial distress—though it is not clear what actual and reliable support exists for such claims. And importantly, regardless of Libre's current revenue as compared to years past, it is not clear that Libre lacks assets that could be used to further compensate class members. Similarly, because Libre is the named party in this action, it is not clear whether the Parties are also alleging that its parent company, Nexus Services, and its affiliates and principals are also unable to compensate class members for the harm they incurred.

Class counsel says that "LBN provided evidence of limited capital that would be unlikely to satisfy a large judgment."[39] But the Parties do not explain what that evidence was or specifically what it showed. Thus, there is no reason for the Court to accept a class action settlement that the Parties admit is highly discounted when there has been no proof of inability to pay other than attorney representations.

Even taking these claims at face value—that Libre is under extreme financial distress and lacks the wherewithal to compensate class members within years of the settlement agreement—the elongated payment schedule remains concerning. It raises the specter of Libre not being able to make payments to

---

[39] Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Approval of Settlement and Approval of Notice to Class of Settlement, at 9, *Vasquez v. Libre by Nexus*, No. 4:17-cv-755 (July 29, 2020), ECF No. 143.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

the class in the future, even though class members will be immediately providing Libre with an expansive release of their claims. In stark contrast, under the proposed settlement Libre is not committing to refrain from "debt collection" activities in the future.

*Fourth*, a substantial amount of the approximately $1.53 million in "debt relief" that would comprise the remainder of the Settlement Amount is likely to have been uncollectable. Its value to class members should be discounted considerably. *See In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1179 (9th Cir. 2013) (recognizing that where a "class is paid in some other way," other than cash, its "value" may be "difficult to appraise" and it may be of less value of class members). And it should not be viewed as a dollar-to-dollar concession by Libre, which likely considers much of the debt already to be valueless. *See, e.g., Redman v. RadioShack Corp.*, 768 F.3d 622, 632 (7th Cir. 2014) (Posner, J.) ("[W]hile we don't know how much $830,000 of coupons would be worth to the class, we can be confident that it would be less than that nominal amount, doubtless considerably so."). Moreover, although the States do not have objections to much of the prospective relief in the proposed settlement agreement, the value of that relief does not justify the meager monetary portion of the settlement agreement. Although the Parties have said that "the focus of the proposed settlement has appropriately been on critical injunctive relief,"[40] only current and future consumers will enjoy the benefit of those changes; past consumers who were harmed, perhaps to a greater degree, obtain no benefit from future changes. Moreover, at least some of the prospective relief simply remedies previous business practices that violated the law, such as requiring consumers to sign contracts in languages they could not understand.

*Fifth*, the risk of litigation does not, as Libre contends, justify the inadequate relief. The States have pending investigations addressing similar false advertising and deceptive business practices by Libre. Courts have recognized that "in light of these [state consumer protection] statutes and the

---

40 Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Approval of Settlement and Approval of Notice to Class of Settlement, at 6, *Vasquez v. Libre by Nexus*, No. 4:17-cv-755 (July 29, 2020), ECF No. 143.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

evidence that public and private attorneys are prepared to enforce them, class members appear to have substantially stronger claims" than settling parties assert in their Motion for approval of the settlement. *Wilson*, 2011 WL 2050537, at *13 (rejecting proposed settlement's inadequate relief provisions).

**B.    The Notice Process Is Inadequate**

The notice process provided by the settlement agreement is not adequate. It relies principally on the use of text messaging and indirect publication notice. And the Attorneys General are unaware of precedent for accepting text messaging as a principal form of notice to class members. The use of text messaging here is particularly concerning for several reasons.

*First*, the Parties have not explained what safeguards or best practices they are using to ensure that the text message is not treated like spam. And even if the message goes through, it is likely that many class members will believe it to be spam and disregard it.[41] Amici are not aware of any court approving the use of text messages as a notification method unless coupled with another form of direct notice, such as mail notice. *See Nazih v. Cafe Istanbul of Columbus, LLC*, 2018 WL 4334613, at *6 (S.D. Ohio Sept. 11, 2018) (observing that "courts in other districts have allowed the use of text messages *in conjunction with email and postal mail*" (emphasis added) (citation omitted)).

*Second*, the message is only being sent out to a single phone number, even though Libre's records often contain several phone numbers associated with each class member and their friends and family. And the cost associated with sending additional text messages is likely minimal.

*Third*, the settlement agreement does not dictate the frequency or duration of the publication notice, for example by requiring that the notice be published many times over a period of weeks or months.

---

41 *See Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*, at 29, Federal Trade Commission (Sept. 2019) (finding there are substantially higher claims rates for notice campaigns that use notice packets, and finding that "email notice campaigns had the lowest mean and median claims rates"), https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf.

*Fourth*, all of these deficiencies are exacerbated by the fact that many class members may have to submit documents in order to obtain their share of the cash settlement fund. If Libre does not have a Form I-391 in its records, the only way for class members to obtain their share of the cash settlement fund is to submit their Form I-391 themselves. They will not automatically receive the funds. Therefore, it is imperative that they reliably receive notice of the settlement—and be apprised of what they must do, and by what date, to obtain the cash to which they are entitled.

### C. The Release Provision is Excessively Broad

The proposed class action provides minimal monetary relief, and yet the release language, if approved, would absolve Libre of liability for all claims, including those not directly alleged in the current complaint:

> Upon the Final Settlement Approval Date, each Plaintiff and each Settlement Class Member who has not opted out of the Settlement Class releases, waives, and forever discharges LBN Releasees from any and all claims they have or may have against the LBN Releasees arising out of or relating in any way to any of the legal, factual,
> or other allegations made in the Action, or any legal theories that could have been raised based on the allegations of the Action, including without limitation allegations made in any version of the complaint filed in the Action, and any claim regarding the manner of Class Notice (the "Released LBN Claims")[42]

For example, this release could include class members' claims for discomfort and physical injury related to the unlawful placement of a defective GPS tracking device on them. The relief, especially the monetary relief, provided by the settlement would be far inadequate to release such a claim.[43] The Court should therefore reject the proposed settlement release as overbroad.

---

[42] Revised Settlement Agreement at 24.

[43] The agreement, however, does preserve all of the claims that may be asserted by the States. Revised Settlement Agreement at 24 ("The foregoing acknowledgement is not intended to limit the rights and remedies available, if any, to any regulatory authorities. The Parties acknowledge that Plaintiffs and Settlement Class Members cannot release claims brought by governmental entities.").

### D.   <u>The Award to Class Counsel Deserves Scrutiny</u>

Class counsel negotiated a "smooth sailing" provision in the settlement agreement whereby Libre agreed not to oppose an attorneys fee award of up to twenty-five percent of the total Settlement Amount of $3.2 million, or $800,000.[44] "[A] defendant's advance agreement not to object cannot relieve the district court of its duty to assess fully the reasonableness of the fee request." *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 943 (9th Cir. 2011); *see also Staton v. Boeing Co.*, 327 F.3d 938, 963-64 (9th Cir. 2003); *Knisley v. Network Assoc's*, 312 F.3d 1123, 1125 (9th Cir. 2002). Indeed, "the very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). In addition, when settlements are negotiated before the Court certifies the class, close scrutiny of the settlement is necessary to protect class members. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also True*, 749 F. Supp. 2d at 1078 ("The Court does not suggest any intentional fiduciary breach by class counsel, but 'even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations.'" (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003))).

The fee claim of $800,000 is more than the total amount of cash payments that Libre would pay under the settlement agreement. Moreover, the Settlement Amount of $3.2 million on which the $800,000 is based, for the reasons explained above, is larger than the actual amount of relief that the class will receive. *See In re HP Inkjet Printer Litig.*, 716 F.3d at 1179 ("[W]here class counsel is paid in cash, and the class is paid in some other way, . . . comparing the value of the fees with the value of the recovery is substantially more difficult."). For example, the $3.2 million includes the face value of debt

---

[44] Revised Settlement Agreement at 17.

relief that is likely uncollectable and should be discounted. Nevertheless, those values are used to peg class counsel's fees. Courts have rejected other proposed class actions where the attorney's fees comprised a smaller portion of the defendant's payments. *See, e.g., Dennis*, 697 F.3d at 868 (rejecting a $2 million attorney fee comprising 19.5% of the total nominal cost to Defendant as excessive and denying approval of the proposed settlement). Disproportionate benefit to class counsel weighs in favor of rejection of the proposed settlement. *See Williams*, 720 F.2d at 923 ("The court should [e]nsure that the interests of counsel and the named plaintiffs are not unjustifiably advanced at the expense of unnamed class members.").

In addition, as discussed above, the proposed settlement contains multiple provisions that are not fair or reasonable, suggesting a failure to protect the interests of certain absent members in negotiating the proposed settlement, including inadequate monetary relief, the use of forms of notice that risks excluding class members from the benefit of the settlement, and an overly broad release.

Courts have held that failure to represent the interest of all class members' claims renders the settlement not binding on class members whose interest was not protected. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 588 (9th Cir. 2010) ("Without adequate representation, a court order approving a claim-preclusive class action settlement cannot satisfy due process."). Where the proposed settlement contains provisions that do not substantially benefit certain absent class members while being extremely beneficial to Libre, the Court should exercise its discretion to either direct the parties to modify their proposal or reject it.

1

## CONCLUSION

2
For the reasons set forth above, the Attorneys General respectfully urge the Court to reject the

3
proposed settlement as currently filed because it is not fair, reasonable or adequate.

4
Dated:  October 23, 2020
        New York, NY

5

6
Respectfully Submitted,

7
**LETITIA JAMES**
Attorney General of the State of New York

8

9
By and Through:

10
/s/ Gavin G. McCabe

11
GAVIN G. MCCABE
JOSEPH P. MUELLER

12
Assistant Attorneys General

13
JANE M. AZIA
Bureau Chief

14
Bureau of Consumer Frauds and Protection

15
LAURA J. LEVINE
Deputy Bureau Chief

16
Bureau of Consumer Frauds and Protection
New York Office of the Attorney General

17
28 Liberty Street
New York, NY 10005

18
(212) 416-8321

19

20
The following Attorneys General join in this brief:

21
**MARK HERRING**
Attorney General for the Commonwealth of Virginia

22
202 North Ninth Street
Richmond, VA 23219

23

24
**MAURA HEALEY**
Attorney General for the Commonwealth of Massachusetts

25
One Ashburton Place, 20th Floor
Boston, MA 02108

26

27

28

Amicus Curiae Brief in Opposition to the Proposed Settlement (4:17-cv-7755-CW)

**ATTESTATION OF SIGNATURES**

I, Gavin G. McCabe, hereby attest, pursuant to Locals Civil Rule 5-1(i)(3) of the Northern District of California that concurrence in the filing of this document has been obtained from each signatory hereto.

/s/ GAVIN G. MCCABE

Gavin G. McCabe