1   ANNICK M. PERSINGER, SBN 272996
    **TYCKO & ZAVAREEI LLP**
2   10880 Wilshire Blvd., Suite 1101
    Los Angeles, CA 90024
3   Telephone (510) 254-6808
    Facsimile (202) 973-0950
4   *apersinger@tzlegal.com*

5
    *Attorneys for Plaintiffs*
6   *Additional Attorneys on Signature Page*

7

8               **UNITED STATES DISTRICT COURT**
9               **NORTHERN DISTRICT OF CALIFORNIA**

10

11  JUAN QUINTANILLA VASQUEZ, GABRIELA        CASE NO. 4:17-cv-00755-CW
    PERDOMO ORTIZ, VICTOR HUGO CATALAN
12  MOLINA, and KEVIN CALDERON, individually   **PLAINTIFFS' NOTICE OF MOTION**
    and on behalf of all others similarly situated,   **AND MOTION FOR FINAL APPROVAL**
13                                            **OF CLASS ACTION SETTLEMENT;**
                                              **MEMORANDUM IN SUPPORT**
14              Plaintiff,

15      v.                                    Date:      Dec. 9, 2020
                                              Time:      2:30 p.m.
16  LIBRE BY NEXUS, INC. and JOHN DOES 1-50,  Courtroom:  6
                                              Judge:     Hon. Claudia Wilken
17              Defendants.

18

19

20

21

22

23

24

25

26

27

28

                                    i

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................1

II.  LITIGATION AND SETTLEMENT HISTORY .........................................................3

III.  SUMMARY OF THE SETTLEMENT BENEFITS ....................................................4

IV.  CLASS NOTICE WAS PROVIDED AS DIRECTED BY THE COURT. ................6

V.  THE LEGAL STANDARD FOR FINAL APPROVAL .............................................6

VI.  THE AGREEMENT IS FAIR AND REASONABLE. ...............................................7

    A.  A presumption of fairness applies to the Settlement............................................7

        1.  The Settlement was negotiated at arm's length. ...................................7

        2.  The Settlement followed extensive investigation and discovery..........8

        3.  Experienced Class Counsel negotiated the Settlement.........................8

    B.  Additional criteria favor approval of the Settlement. ..........................................9

        1.  The Settlement provides substantial relief to the Class. ......................9

        2.  The Settlement eliminates the real risk of no recovery. ....................11

        3.  The Settlement compares favorably to potential relief. .....................11

        4.  The Settlement enjoys overwhelming class support. ..........................14

            a.  Neither of the objections weigh against final approval. ....................15

                i.  The Settlement addresses the stated purposes of the AG objectors' investigation. ...........................................................15

                ii.  The AG objectors misapprehend the structure of the Settlement and underestimate the monetary benefits......................16

                iii.  The timeline for funding the Settlement Amount was the subject of arm's-length negotiations that followed the outbreak of the ongoing COVID-19 Pandemic. ...........................17

                iv.  Contrary to the AG objectors' argument, the release is well-tailored and not overbroad. ..........................................18

                v.  The Notice Plan approved by the Court was sound. ......................18

                vi.  Class Counsel's requested fee is reasonable .....................................20

VII.  THE CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES .........22

VIII.  CONCLUSION .........................................................................................................22

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
Case No. 4:17-cv-00755-CW

1

**TABLE OF AUTHORITIES**

**CASES**

2

3

*Adams v. Inter-Con Sec. Sys. Inc.,*
    No. C-06-5428 MHP, 2007 WL 3225466 (N.D. Cal. Oct. 30, 2007).........................8

4

*Bhumithanarn v. 22 Noodle Mkt. Corp.,*
    No. 14-CV-2625 RJS, 2015 U.S. Dist. LEXIS 90616, 2015 WL 4240985 (S.D.N.Y. July 13, 2015) ..21

5

*Blackwell v. Foley,*
    724 F. Supp. 2d 1068 (N.D. Cal. 2010) ...............................................24

6

7

*Ching v. Siemens Indus., Inc.,*
    No. 3:11-cv-04838-MEJ, 2014 U.S. Dist. LEXIS 89002 (N.D. Cal. June 27, 2014).............15

8

*Churchill Vill., L.L.C. v. General Electric,*
    361 F.3d 566 (9th Cir. 2004) ..........................................................15

9

10

*Custom LED, LLC v. eBay, Inc.,*
    No. 12-cv-00350-JST, 2014 WL 2916871 (N.D. Cal. June 24, 2014) ......................12

11

12

*De Leon v. Ricoh USA, Inc.,*
    No. 18-cv-03725-JSC, 2020 U.S. Dist. LEXIS 56285 (N.D. Cal. Mar. 31, 2020) ..............16

13

*Dickey v. Advanced Micro Devices, Inc.,*
    No. 15-cv-04922-HSG, 2020 U.S. Dist. LEXIS 30440 (N.D. Cal. Feb 21, 2020) ..............15

14

15

*Farrell v. Bank of Am. Corp., N.A.,*
    Nos. 18-56272, 18-56273, 18-56371, 2020 U.S. App. LEXIS 27980 (9th Cir. Sep. 2, 2020) ..............19

16

*Farrell v. Bank of Am., N.A.,*
    327 F.R.D. 422 (S.D. Cal. 2018) ......................................................19

17

18

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) .......................................................7, 9

19

*Horn v. Bank of Am., N.A.,*
    No. 3:12 cv-1718-GPC-BLM, 2014 U.S. Dist. LEXIS 51972 (S.D. Cal. Apr. 14, 2014) ...............19

20

21

*In re Anthem, Inc. Data Breach Litig.,*
    327 F.R.D. 299 (N.D. Cal. 2018).................................................11, 15

22

*In re Diamond Foods, Inc.,*
    No. C 11-05386 WHA, 2014 U.S. Dist. LEXIS 3252 (N.D. Cal. Jan. 10, 2014)...................2

23

24

*In re HP Inkjet Printer Litig.,*
    716 F.3d 1173 (9th Cir. 2013) .......................................................18

25

*In re Hyundai and Kia Fuel Economy Litig.,*
    926 F.3d 539 (9th Cir. 2019) ..........................................................6

26

27

*In re Tobacco Cases II,*
    240 Cal. App. 4th 779, 192 Cal. Rptr. 3d 881 (2015)................................14

28

iii

*In re Yahoo Mail Litig.*,
   Nos. 13-CV-4980-LHK, 2016 U.S. Dist. LEXIS 115056 (N.D. Cal. Aug. 25, 2016)............................ 14

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ........................................................................................................ 9

*Lawrence v. A-1 Cleaning & Septic System Sys., LLC*,
   2020 U.S. Dist. LEXIS 74685, 2020 WL 2042323 (S.D. Tex. Apr. 28, 2020) ....................................... 20

*McCalvin v. Condor Holdco Securitization Tr.*,
   No. 17-1350, 2018 U.S. Dist. LEXIS 190366 (E.D. Pa. Nov. 6, 2018) ..................................... 18

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) .......................................................................................... 8, 11, 12

*Officers for Justice v. Civ. Serv. Comm'n of City and County of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ................................................................................................ 7, 12

*Parkinson v. Hyundai Motor Am.*,
   796 F. Supp. 2d 1160 (C.D. Cal. 2010) ......................................................................................... 24

*Perkins v. Linkedin Corp.*,
   No. 5:13-cv-04303-LHK, 2016 U.S. Dist. LEXIS 18649 (N.D. Cal. Feb. 16, 2016)............................ 16

*Rannis v. Recchia*,
   380 F. App'x 646 (9th Cir. 2010) ....................................................................................... 22

*Rodriguez v. West Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ......................................................................................................... 7

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ....................................................................................................... 14

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ......................................................................................................... 4

*Thrower v. UniversalPegasus, Int'l Inc.*,
   2020 U.S. Dist. LEXIS 161132, 2020 WL 5258521 (S.D. Tex. Sept. 2, 2020) ................................... 21

*Winans v. Emeritus Corp.*,
   No. 13-cv-03962-HSG, 2016 U.S. Dist. LEXIS 3212 (N.D. Cal. Jan. 11, 2016) ................................. 22

*Yates v. Checkers Drive-in Rest., Inc.*,
   No. 17 C 9219, 2020 U.S. Dist. LEXIS 205241 (N.D. Ill. Nov. 3, 2020) ....................................... 20, 21

**STATUTES**

Fed. R. Civ. P. 23 ........................................................................................................... 9, 17-22

Fed. R. Civ. P. 30(b)(6).......................................................................................................... 3

**TREATISES**

Newberg on Class Actions § 14:03 (3d ed. 1992)...............................................................12, 18, 25, 27

Manual for Complex Litigation, § 21.312 (4th ed. 2004) ...................................................... 17

iv

### NOTICE OF MOTION AND MOTION
### FOR PRELIMINARY APPROVAL OF SETTLEMENT

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on December 9, 2020, at 2:30 p.m., or as soon thereafter as the matter may be heard by the Honorable Judge Claudia Wilken of the United States District Court for the Northern District of California, Oakland Division, in Courtroom 6, located at the Ronald V. Dellums Federal Building and U.S. Courthouse, 1301 Clay Street, Oakland, California 94612, Plaintiffs Juan Quintanilla, Gabriela Perdomo Ortiz, Victor Hugo Catalan Molina, and Kevin Calderon, by and through their undersigned counsel of record, will and hereby do move the Court for an order granting final approval of the parties' proposed Settlement Agreement and Release and exhibits thereto, dated July 29, 2020.[1]

This Motion is based on Federal Rule of Civil Procedure 23, this Notice of Motion, the supporting Memorandum of Points and Authorities, the Settlement Agreement, the accompanying declarations of Jesse Newmark ("11/9/2020 Newmark Decl.") and Jennifer M. Keough ("Keough Decl."), the pleadings and papers on file in this action, and any additional information or argument as the Court may consider.

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Settlement Agreement.

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The proposed Settlement Agreement and Release ("Agreement") establishes a $3.2 million settlement fund that will provide cash payments and debt relief to class members, and cover administration costs, reasonable attorney's fees and expenses, and service awards. 6/2/2020 Rathod Decl., Ex. 1, Agreement ¶ II.A.1. Not only will the Settlement provide this significant direct monetary compensation, it will also provide extensive injunctive relief to class members facing the hardships of immigration, detention, and financial distress. Critically, the injunctive relief resolves all of the alleged misrepresentations and other violations of law underlying Plaintiffs' claims.[2] Moreover, it provides for comprehensive financial and non-financial relief that likely goes beyond what Plaintiffs could have achieved even if they were successful at trial. The proposed Agreement is also presumptively fair because it was negotiated after more than three years of contested litigation, and following six mediations, several in-person negotiations, and countless other meetings, phone calls, and emails.

On July 31, 2020, finding that the Agreement "resulted from extensive arm's length negotiations between the parties" and "falls within the range of possible approval because it is fair, reasonable, and adequate," the Court preliminarily approved the Settlement. Since then, the Parties have complied with the Agreement and the Court's Preliminary Approval Order and provided notice to the class. The response rate confirms that the Class Notice effectively provided the best notice practicable as required by due process. Indeed, there were over 6,750 unique visitors to the settlement website, and over 2,000 calls to the administrator. Keough Decl. ¶¶ 14, 16.

The response to the Settlement has also been overwhelmingly favorable. Even though the response rate to the Class Notice was high, opt-outs to the Settlement were low—only ten of the approximately 46,000 class members have opted out of the Settlement as of the October 25, 2020 deadline. There were also only two objections to the Settlement. *Id.* ¶¶ 18, 20.

---

[2] Although the injunctive relief does not specifically address Defendant's alleged violations of California's Department of Insurance laws and regulations, the Department's separate settlement with Defendant requires its compliance with those rules.   (See http://www.insurance.ca.gov/0400-news/0100-press-releases/2020/upload/nr065LibreStipWaiver07152020.pdf.)

1

The first limited objection, submitted by a class member represented by the Legal Aid Justice Center, merely seeks clarification on the release, and can be resolved.[3] The other objection is brought not by a member of the Settlement Class, but by the Attorney General of New York and joined by the Attorneys General of Virginia and Massachusetts. In arguing that the Settlement is insufficient, the objection fails to appreciate the value of the comprehensive financial and non-financial injunctive relief for the class—including , for instance, the complete elimination of ankle monitors and total monthly payment caps to bond amounts, saving class members hundreds of millions of dollars in charges.

The objection also fails to appreciate that, given the risks, it is reasonable for counsel and the class representatives to prefer the bird in hand. *See In re Diamond Foods, Inc.*, No. C 11-05386 WHA, 2014 U.S. Dist. LEXIS 3252, at *9 (N.D. Cal. Jan. 10, 2014). The Settlement here followed years of negotiations, and the case involved novel and complex factual issues and legal theories that made continued litigation risky, with the chance of no recovery at all. Even if Defendant were to lose its appeal of the Court's decision to deny Defendant's motion to compel arbitration, and Plaintiffs were able to certify a class, defeat summary judgment, and prevail at trial, there is reason to believe that Defendant has limited capital to satisfy a judgment.[4] As a result, even if Plaintiffs were ultimately successful, the direct monetary benefits available to class members could be less than those obtained here.

For all of these reasons and the reasons set forth below, Plaintiffs submit that the Settlement is plainly fair, adequate, and reasonable, and should be finally approved.[5]

---

[3] The Settlement Agreement sets the deadline for Class Counsel to respond to objections at 7 days before the Final Approval Hearing. Thus, while Class Counsel addresses the AG objection below, Class Counsel continues to confer with Defendant about the class member objection and may submit a further response to the objection on December 2, 2020, in advance of the December 9, 2020 hearing. Settlement Agreement pp. 23, IV.E.12.

[4] This limited capital is, in part, because LBN has granted fee waivers and not engaged in debt collection for amounts owed by its indigent clientele.

[5] By separate motion filed on September 1, 2020, Plaintiffs also ask the Court to: (1) grant service awards of $10,000 to each of the four Named Plaintiffs and Class Representatives; and (2) award Class Counsel reasonable attorneys' fees, costs, and litigation expenses in the amount of $800,000 (equal to 25% of the settlement amount, not counting the value of the substantial injunctive relief).

2

## II.     LITIGATION AND SETTLEMENT HISTORY

On February 15, 2017, Plaintiffs Vasquez and Ortiz filed a Class Action Complaint alleging that Defendant Libre by Nexus ("LBN") failed to translate its contracts, made misleading representations about monthly payments, required oppressive ankle monitors that forced participants to be tethered to a wall, leveraged oppressive terms like monthly payments that in total exceeded the amounts of the hefty immigration bonds maintained by the participants, and harassed participants for payment by making ICE-related threats. Dkt. 1. Plaintiffs subsequently amended their pleadings, adding Plaintiffs Victor Hugo Catalan Molina, and Kevin Calderon, among other amendments. Dkts. 14, 25, 102, 146.

On July 10, 2017, LBN filed a Motion to Dismiss Counts V and VI of the Second Amended Complaint, Dkt. 34, and a Motion to Compel Arbitration, Dkt. 35. On August 20, 2018, the Court denied in part and granted in part LBN's Motion to Dismiss and denied its Motion to Compel Arbitration. Dkt. 76.

On September 18, 2018, LBN filed a Notice of Appeal to the Ninth Circuit of the Court's Order on the Motion to Compel and Motion to Dismiss. Dkt. 80. LBN then filed Motions to Stay Pending Appeal and for Leave to Appeal Order Denying Motion to Dismiss Pursuant to 28 U.S.C. Section 1292(b). Dkts. 86, 87. On November 20, 2018, the Court denied LBN's Motions. Dkt. 98. The Ninth Circuit appeal is still pending—and could be for years.

The Parties also participated in extensive fact discovery. Plaintiffs served LBN with discovery requests, took a Rule 30(b)(6) deposition, and reviewed thousands of pages of documents that LBN produced. 6/2/2020 Rathod Decl. ¶¶ 15-17. LBN deposed all four of the Plaintiffs, as well as two of the Plaintiffs' sponsors. *Id.* ¶ 18. Discovery was set to close shortly after the parties reached an agreement to settle.

While the Parties litigated the case, they also participated in several all-day mediation sessions over a span of almost two years, including three with Hon. James R. Lambden of ADR Services, Inc. and three with Jill R. Sperber, Esq. of Judicate West. *Id.* ¶¶ 20, 22-24, 36-37. The Parties also convened for several other in-person sessions and telephonic sessions without the assistance of a mediator. *Id.* ¶¶ 20, 32. On September 4, 2019, the Parties participated in an all-day mediation conducted by Ms. Sperber, which resulted in the Parties agreeing on the material terms of the Settlement. *Id.* ¶ 37.

1    Following months of effort between the Parties to finalize a fully executed the settlement

2    agreement, an irreconcilable dispute arose and the global COVID-19 pandemic created uncertainty,

3    necessitating another all-day mediation to be conducted by Ms. Sperber to fully and finally execute the

4    Agreement. Plaintiffs then filed a motion for preliminary approval. At the July 21, 2020 hearing on

5    Plaintiffs' motion, the Court suggested that it was inclined to grant preliminary approval if the Parties

6    were able to address several issues. Plaintiffs submitted a supplemental brief, a revised Settlement

7    Agreement and Release, a revised proposed Fourth Amended Complaint, revised Class Notices, and

8    revised proposed preliminary and final approval orders. Plaintiffs also submitted a declaration from the

9    claims administrator regarding Class Action Fairness Act notice pursuant to 28 U.S.C. § 1715. On July

10   31, 2020, the Court granted preliminary approval of the Settlement.

11   ## III.   SUMMARY OF THE SETTLEMENT BENEFITS

12       The proposed Agreement establishes a $3.2 million settlement fund to benefit the class. From

13   the $3.2 million Settlement Amount, LBN will provide $750,000 in cash payments to the Former and

14   Current Program Participant Payments Subclass and Sponsor Payments Subclass. Each qualifying

15   member of the Payment Subclasses shall be entitled to receive a pro rata payment from the $750,000.

16   Agreement ¶ II.A.1.a.[6] The costs of claims administration (capped at $80,000) and reasonable attorneys'

17   fees and costs will also be paid by the $3.2 million fund.[7] Because of financial constraints imposed by

18   COVID-19, LBN will fund the Settlement Amount in 12 monthly payments starting on January 1, 2023.

19   If LBN reaches certain pre-COVID revenue benchmarks, the Settlement Amount could be funded

20   sooner. *See id.* ¶ II.C.2. Attorneys' fees will not be paid before the class. The remainder of the fund—

21   approximately $1.53 million—will be provided to the class as debt relief.

22       The Settlement provides invaluable and comprehensive injunctive relief as well. This includes

23   financial relief for the Current Program Participant Subclass in the form of: (a) a total monthly payment

---

[6] As described in detail in the Agreement, residual funds may be redistributed to eligible class members on a pro rata basis, if there are sufficient funds remaining. Otherwise, they will be distributed as cy pres awards, subject to the Court's approval. See Agreement Section II.A.1.a.i.

[7] The cost of notice administration, which protect class members' rights, as well as attorney's fees and costs spent bringing the action, are also benefits to the class. *See, e.g., Staton v. Boeing Co.,* 327 F.3d 938, 975 (9th Cir. 2003) . Accordingly, the whole Settlement Amount, as opposed to just the net amount, benefits the Settlement Class.

4

cap for each class member to their bond amount; (b) consecutive payment discounts; (c) timely and in full payment discounts; and (d) a minimum of $150,000 each year in annual fee waivers, as defined in the Agreement. *Id.* ¶¶ II.A.2, II.B.1.j, m. Thus, the monetary benefits from the Settlement far exceed the $3.2 million fund.

Class Counsel have also negotiated critical non-monetary relief that Plaintiffs sought to achieve since the start of the litigation. *Id.* ¶ II.B. This programmatic overhaul to LBN's business model cannot be ascribed a dollar value. LBN agreed to translate its documents into Spanish and at least one other non-English language to ensure disclosure of the material terms of its services. LBN also agreed to improve its efforts to ensure that future program participants and their sponsors are aware of and understand the material terms of the contracts prior to the participants release from detention—by, *inter alia*, posting its contract in audio formats on its website, using best efforts to mail its contract to detainees in ICE custody, and obtaining informed representations that potential participants are aware of their rights and have the right to an attorney.

In weighing the benefits of the Settlement over the risks of trying to obtain and collect a favorable judgment, Class Counsel also assured themselves in their many negotiations and meetings with LBN over the years that LBN had greatly reduced the percentage of program participants required to wear ankle monitors, to approximately 27%, and would continue to do so. Specifically, LBN agreed to only require leg-affixed monitors for new participants who have an immigration bond in excess of $7,500, and to promptly remove monitors in the event of pregnancy or medical necessity and after the termination of immigration proceedings. LBN also agreed to transition entirely away from ankle monitors by the end of 2021, by using less intrusive wrist monitors, cellular phones, and check-ins.

Prior to reaching the Agreement, Class Counsel also confirmed that LBN had upgraded its equipment for participants still required to wear an ankle monitor. While the monitors that Plaintiffs first complained of in this action required participants to be tethered to an electrical outlet for hours at a time, the upgraded monitors are smaller and have a removable, rechargeable battery pack. The Agreement also expressly provides that all participants have been transitioned to this upgraded monitor.

To address Plaintiffs' FDCPA and Rosenthal Claims, Class Counsel obtained LBN's agreement to modify its criminal prosecution language in its contracts. LBN also agreed not to make any verbal or

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW

written threats to report class members or their families to ICE or otherwise threaten immigration detention.

In sum, in addition to the sizeable $3.2 million Settlement Amount, the invaluable changes to LBN's practices will allow LBN to continue to provide its service of obtaining release from immigration detention for those who otherwise may have no recourse, with improved terms for those who turn to LBN to obtain release.

## IV.   CLASS NOTICE WAS PROVIDED AS DIRECTED BY THE COURT.

After preliminary approval, the Parties provided Notice of the Settlement in conformance with this Court's Preliminary Approval and Provisional Class Certification Order. On August 14, 2020, LBN provided JND Legal Administration with access to the telephone numbers of class members for whom it has contact information. Keough Decl. ¶ 3; Agreement ¶ IV.E.1.

Then, from August 31 to September 14, 2020, JND provided the Court-approved notice to the Class as follows: (1) direct Text Message Notice in both English and Spanish to all class members for whom LBN had telephone numbers; (2) direct Postcard Notice to the class members for whom text message notice and two additional message attempts or other information indicated that the message did not reach the recipient; (3) published notice in La Opinion, El Sol, and El Mundo; (4) mailed notice to the American Immigration Lawyers Association and National Immigration Project of the National Lawyers Guild, organizations for immigration attorneys who represent class members; and (5) publication of the Detailed Notice on the Settlement Website. Keough Decl. ¶¶ 4-9, 11-12; Agreement ¶ IV.E, Exs. E-G.

The Court-approved notices informed class members about the proposed Settlement, their rights as to the $3.2 million Settlement Amount, their rights to object or opt-out of the Settlement; and the prospective request for attorneys' fees and expenses and service awards. Agreement ¶ IV.C, Exs. E-G.

## V.   THE LEGAL STANDARD FOR FINAL APPROVAL

The law favors the settlement of class actions. *See, e.g., In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (en banc). "[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he [or she] is exposed to the litigants and their strategies, positions, and proof." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)

(internal citations and quotations omitted). To grant final approval of a settlement, "Fed. R. Civ. P. 23(e) requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Id.* "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Id.* In making this assessment, courts must balance several similar factors, including the "*Hanlon*" or "*Churchill*" factors, set forth below.

The Court's role in reviewing "what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civ. Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

The proposed Settlement meets the requirements for final approval.

## VI.   THE AGREEMENT IS FAIR AND REASONABLE.

### A.   A presumption of fairness applies to the Settlement.

The Settlement is presumptively fair as (1) it is the result of arms' length negotiations, (2) there has been investigation and discovery sufficient to permit counsel and the court to act intelligently, and (3) counsel are experienced in similar litigation. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (stating that the Ninth Circuit "put[s] a good deal of stock in the product of an arm's-length, non-collusive, negotiated resolution"); *see also id.* at 967 ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("*DIRECTV*") (explaining that class settlements are presumed fair when they are reached "following sufficient discovery and genuine arms-length negotiation"); *Stewart v. Applied Materials, Inc.*, No. 15-cv-02632-JST, 2017 WL 3670711, at *6 (N.D. Cal. Aug. 25, 2017) (explaining that "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness").

#### 1.   The Settlement was negotiated at arm's length.

The Settlement was negotiated at arm's length during several all-day mediation sessions over a span of almost two years, including three with the Hon. James R. Lambden of ADR Services, Inc. and three with Jill R. Sperber, Esq. of Judicate West. 6/2/2020 Rathod Decl. ¶¶ 20, 22-24, 36-37. *See Adams*

7

*v. Inter-Con Sec. Sys. Inc.*, No. C-06-5428 MHP, 2007 WL 3225466, at *3 (N.D. Cal. Oct. 30, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."). Plaintiffs also revised the Settlement to address several issues raised by the Court. Thus, nothing should disturb the Court's preliminary determination that the proposed Settlement is the product of hard-fought settlement discussions and negotiations between Plaintiffs and LBN.

2.    <u>The Settlement followed extensive investigation and discovery.</u>

Before agreeing upon the terms of the Settlement, the Parties conducted a thorough examination and investigation of the facts and law in this litigation. Class Counsel requested and received written discovery responses from LBN, examined those documents, and questioned LBN at a 30(b)(6) deposition. 6/2/2020 Rathod Decl. ¶¶ 15-20. LBN deposed the four Class Representatives and two of their sponsors. Class Counsel also issued written document and deposition subpoenas to third-party surety companies. *Id.* ¶ 19. Some of these third parties produced documents, which Class Counsel analyzed. *Id.* Class Counsel also conducted outreach to, and received information from, numerous Class Members and third-party witnesses, including former LBN employees, immigration attorneys, organizations that represent LBN clients and sponsors, and state attorneys general and other government agencies. *Id.* ¶¶ 6, 19. Class Counsel also engaged in substantial motion practice, including defending against LBN's motions to compel arbitration, dismiss certain claims, and for leave to appeal and stay the proceedings, as well as various discovery motions and motions to amend the pleadings. As a result, Class Counsel is versed in the novel and complex issues raised in this case of first impression.

3.    <u>Experienced Class Counsel negotiated the Settlement.</u>

Class Counsel have extensive experience in consumer, immigrants' rights, and other class action litigation. 6/2/2020 Rathod Decl. ¶ 32; 6/2/2020 Persinger Decl. ¶ 7, Ex. 1; 6/2/2020 Newmark Decl. ¶¶ 3-21. Based on their experience, including comparable cases that they have settled, Class Counsel concluded that the Settlement provides exceptional results for the class while sparing the class from the uncertainties of continued and protracted litigation. 6/2/2020 Rathod Decl. ¶ 39; 6/2/2020 Persinger Decl. ¶¶ 4-5; 6/2/2020 Newmark Decl. ¶ 22.

8

**B.      Additional criteria favor approval of the Settlement.**

Although there is an initial presumption of fairness, the Court must independently analyze the Settlement to determine whether it is in the best interests of the class, considering:

> [t]he strength of plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1026). Each of these factors weighs in favor of finally approving the Settlement.

### 1.      The Settlement provides substantial relief to the Class.

The Settlement provides substantial relief that can be divided into three broad categories.

**First**, Plaintiffs secured a common fund of $3.2 million, including: (a) $750,000 in cash payments to the Payments Subclasses; and (b) approximately $1.53 million in debt relief for the Current Program Participant Subclass. These amounts are particularly significant given concerns as to LBN's financial situation. Plaintiffs estimate that the Payments Subclasses will include approximately 6,000 class members, resulting in a pro rata payment of approximately $125 for each Subclass member (or $250 for each sponsor and participant pair). *See* 6/2/2020 Rathod Decl. ¶ 6. Plaintiffs estimate that the Current Program Participant Subclass includes approximately 21,000 class members, resulting in an average debt reduction of about $73 per participant. *Id.* ¶ 7. However, since some of the Subclass members do not have any debt, those that do will receive higher debt reductions, since the debt relief shares of Subclass members without any debt will be divided among the Subclass members that do have debt. *Id.*

**Second**, the Settlement addresses Plaintiffs' allegations that LBN: failed to translate its contracts; made numerous misrepresentations; oppressively threatened contact with ICE, immigration detention, or criminal prosecution; and required burdensome ankle monitors. As discussed above, LBN's sweeping changes to its monitoring practices include already transitioning all participants to substantially smaller ankle monitors that do not require anyone to tether themselves to an electrical outlet, and moving quickly to entirely stop the use of ankle monitors, among other critical changes.

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW

**Third**, to address Plaintiffs' allegations as to LBN's burdensome financial terms, LBN has agreed to: (1) a total payment cap (already implemented following *preliminary* approval) to limit total monthly payments to the face amount of the immigration bond for all participants (previously there was no cap on monthly payments), even if they have previously missed or made late payments; (2) on-time and consecutive payment discounts to reduce monthly payments; (3) annual fee waivers of at least $150,000; and (4) a representation that LBN has not and does not intend to engage in debt collection activities for past due monthly recurring Program Payments through external providers as to any debts owed as of September 1, 2019. *See* Agreement Sections II.A & II.B.1.j.

The financial value of the bond cap is particularly notable. When this suit commenced, LBN charged all participants $420 per month until the participants could demonstrate (through submission of an I-391 form) that their immigration cases had terminated and LBN faced no risk from a breach of their bond. Plaintiffs estimate that the average participant's immigration case, and therefore monthly payments, would last about five years. Rathod Decl. ¶ 10. Thus, the average LBN participant would have been charged approximately $25,000 in monthly payments. With the cap, participants with bonds between $2,500 and $10,000 (about 50% of LBN's clients) would instead be charged only up to their bond amounts, for an average savings of about $17,500. These approximately 24,000 estimated class members and their sponsors would therefore save about $210 million in charges. Plaintiffs conservatively estimate that participants with higher bonds would see average savings of about $5,000 each, for a total savings of $60 million. In sum, the approximately 48,000 estimated class members would save approximately $270 million in monthly charges from the bond cap alone.

The consecutive and timely payment discounts will also provide significant financial relief, particularly for class members with the highest bond amounts, who LBN now charges up to $475 per month. When those class members pay on time, they will now never pay more than $415 (and will pay as low as $380 if they have made six consecutive payments on time)—less even than the $420 LBN charged all class members at the start of this litigation. It is also worth noting that, after revising its contracts in response to this litigation, LBN now charges class members with smaller bond amounts (less than $10,000) between $250 and $375 per month (not counting the additional discounts). This

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW

change also substantially benefited the class. Moreover, through the $150,000 in annual fee waivers, LBN has committed to additional financial relief of at least $750,000 over the next five years.

### 2.   The Settlement eliminates the real risk of no recovery.

While the Settlement in this case would provide benefits to the class that are certain, if Plaintiffs continued to litigate this case, the class would likely not see any recovery for several more years, and there is a real risk that there would never be any recovery at all. The potential risks and duration of further litigation therefore support final approval. Courts have long recognized the inherent risks and "vagaries of litigation," and emphasized the comparative benefits of "immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *DIRECTV*, 221 F.R.D. at 526; *see also In re Anthem, Inc. Data Breach Litig.,* 327 F.R.D. 299, 318 (N.D. Cal. 2018) (delay in recovery as a result of trial and appellate proceedings weighs in favor of final approval where "[s]ettlement provides the Class with timely, certain, and meaningful recovery").

Here, Plaintiffs faced the significant risks: that LBN could prevail on appeal and that they would be compelled to arbitration, on an individual basis, with no recovery for the class; that LBN would have defeated or limited the scope of class certification, or won on summary judgment; that Plaintiffs would lose at trial; or that Plaintiffs would not be able to collect a judgment from LBN if they did win. Plaintiffs faced defense counsel who had already vigorously litigated the case and had begun to prepare an effective defense based on, for example, the fact that without LBN, Plaintiffs would have remained in detention. Thus, LBN would likely have argued that Plaintiffs and the class were not injured by LBN's representations and are legally barred from restitution, since they received the exact services they paid for, including payment of their bonds and release from detention. LBN also provided evidence of limited capital to satisfy a large judgment.

Conversely, the proposed Settlement provides substantial benefits *now* to a class that has already waited years for relief, and immigrant detainees who will continue to rely on LBN for release from detention. The timeliness of the Settlement relief is therefore particularly important in this case.

### 3.   The Settlement compares favorably to potential relief.

A proposed settlement is not to be measured against "a hypothetical or speculative measure of what might have been achieved." *Officers for Justice*, 688 F.2d at 625; *see also DIRECTV*, 221 F.R.D. at

527 ("[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial."); *Custom LED, LLC v. eBay, Inc.,* No. 12-cv-00350-JST, 2014 WL 2916871, at *4 (N.D. Cal. June 24, 2014) ("[C]ourts have held that a recovery of only 3% of the maximum potential recovery is fair and reasonable . . . .").

Here, besides its substantial size in absolute numbers, the Settlement is fair and reasonable in relation to the Settlement Class's potential damages. After Court-approved fees and costs, service awards, and the costs of notice are deducted from the $3.2 million Settlement Amount, the approximate $2.28 million remaining in the fund will be distributed to the Former and Current Program Participant Subclass and the Sponsor Payment Subclass.[8] Of that amount, $750,000 is specifically set aside for cash payments. The rest of the fund will be distributed as debt relief.

As discussed above, the Settlement will also collectively save class members hundreds of millions of dollars in charges, through the sweeping injunctive relief. It would be difficult to obtain such injunctive relief through continued litigation because Plaintiffs would need to pinpoint a legal claim giving rise to such relief and demonstrate its necessity on these facts. This would be no small task.

Indeed, while the Settlement Amount provides easily estimated monetary relief, the estimated maximum damage for the class is difficult to quantify, for several reasons. However, if Plaintiffs had successfully won on all of their claims and requests for relief, they might have eventually received: (1) injunctive relief ordering LBN to correct its misrepresentations and, potentially, translate its contracts; (2) restitution and actual damages for the class. Plaintiffs roughly estimate that this amount could have been approximately $60,000,000. 7/29/2020 Rathod Decl. ¶ 9. This figure estimates that Plaintiffs and Settlement Class Members paid, or caused to be paid, upfront fees totaling approximately $3,000 per opening transaction and that they could have advanced a theory that $2,500 of this amount should be returned as restitution. *Id.* ¶ 9. Since there are approximately 24,000 participant class members, and therefore 24,000 transactions that involved upfront fees borne by participants and their sponsors to open an account with LBN, that figure multiplied by $2,500 yields the total of $60,000,000. *Id.* ¶ 9.

---

[8] The approximate $2.28 million is calculated by subtracting $800,000 in fees and costs, $80,000 for capped notice expenses, and $40,000 in service awards from the $3.2 million Settlement Amount.

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-cv-00755-CW

1   Plaintiffs reiterate that this is a rough estimate and acknowledge that LBN would have had a number

2   of defenses to this valuation, even if liability were established.

3        Plaintiffs do not believe the full amount could be sought as a refund because approximately

4   $500 of the initiating fees could be said to account for hard costs incurred by the LBN, including the

5   cost of labor in meeting the program participant, providing a meal, presenting the LBN contract, and

6   affixing and activating the GPS monitoring device. Further, it is unlikely that Plaintiffs would be able

7   to receive a total refund because they would have to demonstrate that the benefit LBN conferred had

8   "*no* value to them." *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 795 (2015) (emphasis in original); *see*

9   *also Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (holding that when plaintiffs seek

10  equitable remedies under the UCL or CLRA, but do not show that a legal remedy is unavailable, the

11  equitable claims may be subject to dismissal).

12       Thus, even comparing only the potential financial value of the proposed Settlement with the

13  soaking wet value of a potential monetary recovery following a final decision on the merits ($60,000,00),

14  the Settlement is more valuable. Taking into account also the non-financial relief provided by the

15  proposed Settlement, Plaintiffs believe that the benefits to the class go well beyond what could have

16  been achieved after a trial victory. For instance, for many of the class members, LBN's agreement to

17  remove their ankle monitors may be worth more than any dollar amount. Indeed, the alleged claims in

18  this action were largely focused on this critically needed injunctive relief—translating contracts,

19  refraining from immigration-related threats, and removing burdensome ankle monitors that required

20  class members to stay in one place while charging. Plaintiffs and Class Counsel therefore prioritized

21  and fought hard to obtain the Settlement's substantial injunctive relief.

22       Importantly, LBN also provided evidence of financial difficulties impacting their ability to pay.

23  Class Counsel also reviewed financial records filed in separate legal actions against LBN. Plaintiffs and

24  Class Counsel therefore reasonably considered these financial issues in assessing the Settlement and

25  determined that any "total victory" in this case—likely after many more years of litigation and appeals—

26  may be on paper only. As courts have stated, "legal uncertainty favors approval." *In re Yahoo Mail Litig.*,

27  Nos. 13-CV-4980-LHK, 2016 U.S. Dist. LEXIS 115056, at *20 (N.D. Cal. Aug. 25, 2016); *see also Dickey*

28  *v. Advanced Micro Devices, Inc.*, No. 15-cv-04922-HSG, 2020 U.S. Dist. LEXIS 30440, at *13 (N.D. Cal.

13

Feb 21, 2020) ("Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.") quoting *Ching v. Siemens Indus., Inc.*, No. 3:11-cv-04838-MEJ, 2014 U.S. Dist. LEXIS 89002, at *13 (N.D. Cal. June 27, 2014)).

In contrast, this Settlement guarantees that all class members will receive direct financial relief or benefit from the comprehensive financial and non-financial injunctive relief. Accordingly, this factor favors final approval.

4.      The Settlement enjoys overwhelming class support.

In determining the fairness of a settlement, the Court should consider class member objections. The absence of a large number of objections to a proposed settlement raises a strong presumption that the terms of the agreement are fair. *See, e.g., Churchill Vill., L.L.C. v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004) (approving a settlement where "only 45 of the approximately 90,000 [.005 percent] notified class members objected to the settlement"); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. at 321.

As discussed, as of the date of this submission, only one of the approximately 48,000 class members has objected to the proposed Settlement, and only ten class members have opted out. Keough Decl. ¶¶ 18, 20. This is particularly notable given that notice was texted and/or mailed to the class members, and published and distributed as discussed. As mentioned, over 2,000 class members contacted the Settlement Administrator directly, with over 6,750 unique visitors to the Settlement Website. *Id.* ¶¶ 14, 16. The limited opt outs, and the high response rate, also indicate a favorable reaction by the class members to the proposed Settlement and provide further support for final approval. *See, e.g., Perkins v. Linkedin Corp.*, No. 5:13-cv-04303-LHK, 2016 U.S. Dist. LEXIS 18649, at *9 (N.D. Cal. Feb. 16, 2016) ("low rates of objections and opt-outs are 'indicia of the approval of the class'") (citation omitted); *In re: Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (low number of objectors (a "handful") and opt-outs (only one) supported trial court's finding that settlement was "fair, adequate and reasonable"); *Hanlon*, 150 F.3d at 1027 (9th Cir. 1998) (upholding approval of settlement where only 971 Class Members, or 0.1% of the class, opted out and only a few objected); *De Leon v. Ricoh USA, Inc.*, No. 18-cv-03725-JSC, 2020 U.S. Dist. LEXIS 56285, at *34 (N.D. Cal. Mar. 31, 2020) ("Courts have repeatedly recognized that the absence of a large number of objections to a proposed

14

class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the Class Members." (internal quotation marks and citation omitted)). Additionally, there were only two objections to the Settlement, and as explained below, neither weigh against approval. Thus, this factor also favors approval.

> a.      *Neither of the objections weigh against final approval.*

As of the October 25 deadline, there were only two objections to the Settlement. The first, from a class member represented by the Legal Aid Justice Center, is a limited objection that seeks only to clarify the scope of the release. While Plaintiffs believe the release already applies only to claims, <u>not</u> affirmative defenses, Plaintiffs do not oppose the requested clarifying statement that "this Agreement does not expressly waive any affirmative defense that any Settlement Class Member may raise in any future debt collection proceeding" should the Court order it.

The other objection is not from a class member, but by the New York State Attorney General, and joined by the attorneys general of Virginia and Massachusetts ("the AG objectors"). For the reasons that follow, the AG objectors' arguments are without merit.

> i.      The Settlement addresses the stated purposes of the AG
>            objectors' investigation.

The AG objectors assert that they have been engaged in their own investigations against LBN because of LBN's use of deceptive and misleading contracts, failure to translate the contracts into Spanish, and use of GPS monitors that sometimes malfunctioned. The objection, however, fails to appreciate that the Settlement achieved in this case addresses each of these concerns. With respect to the contracts, LBN has agreed to translate them, correct alleged misrepresentations, remove misleading references to ICE, and modify criminal prosecution language. The AG objectors also ignore that LBN has agreed to promptly end the use of ankle monitors, and has significantly reduced the burdensome nature of the monitors for those who still wear them in the meantime (through an improved, smaller monitor with a removable battery pack). Additionally, the release in this case explicitly carves out claims brought by states attorneys general, so the AG objectors are free to continue their investigations. Because the Settlement reached in this case addresses the stated purposes of the AG objectors'

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW

investigation, the objection should be afforded little weight. The other arguments presented in the objection are also without merit.

ii.   The AG objectors misapprehend the structure of the Settlement and underestimate the monetary benefits.

To support their argument that the Settlement provides purportedly inadequate monetary relief, the AG objectors attempt to narrow the monetary relief provided by the Settlement to the cash payments going to the small minority of class members who were issued I-391's following completion of their immigration proceedings. In doing so, the AG objectors brush aside debt relief, and ignore the monetary benefits provided by bond caps, discounts for on-time payment and consecutive payments, guaranteed amounts for annual fee waivers, and LBN's reduction of monthly fees for participants with lower bond amounts. As discussed above, these programmatic changes provide financial benefit to class members that is inestimable.

The Agreement sets aside a monetary fund as consideration for the small minority of class members who will not receive the monetary benefits provided for by the agreed-upon injunctive relief. In other words, the $750,000 cash payments and estimated $1.53 in debt relief from the fund are designed to compensate the small minority of class members (approximately 13-15 percent) who are, or within six months of final approval will be, former program participants, or the sponsors of former program participants. The other, much larger group of current program participants and their sponsors will likely comprise between approximately 85-87 percent of the class, and will directly benefit from the many millions of dollars in eliminated or reduced charges going forward, debt relief, and the battery of other injunctive relief secured. *See supra* Section II.

Moreover, because the AG objectors ignore the monetary benefits of the programmatic relief, they also do not meaningfully weigh the impact of further delay that continuing the litigation would have on these thousands of indigent program participants who could start benefiting from the Settlement in this case as soon as it comes into effect. The AG objectors also fail to meaningfully address the fact that there remain significant litigation hurdles like class certification, summary judgment, and trial—the loss of any one of which would mean no recovery at all for the class. Nor do the AG objectors acknowledge the difficulty and complexity of the legal theories in this case. Plaintiffs'

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW

rescission theory, for example, is at risk because prior to contracting with LBN, Plaintiffs and the Class were in detention, and LBN secured their release.

Finally, the AG objectors' argument the $1.53 million in debt relief "should be discounted considerably" is meritless. The participants who will receive debt relief will reduce the amount that is collectible from those class members by LBN and is no different from a cash payment. The cases the AG objectors cite do not support their argument. Both cases involved coupon-only settlements. *See In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1179 (9th Cir. 2013); *Redman v. Redman v. RadioShack Corp.*, 768 F.3d 622, 632. Neither case discusses debt. Forgiveness of a debt owed for missed program payments is not the same as a coupon for the future purchase of a product from the very defendant receiving the release. Indeed, courts routinely include debt relief when calculating the size of a settlement fund. *See, e.g.*, *McCalvin v. Condor Holdco Securitization Tr.*, No. 17-1350, 2018 U.S. Dist. LEXIS 190366 (E.D. Pa. Nov. 6, 2018) (finding that the "total cash value of the Settlement is at least $19,700,000.00, comprised of payment into a Settlement Fund of $5,700,000.00 and the elimination of deficiency balances on Class Members' loans totaling more than $14,000,000.00."); *Farrell v. Bank of Am., N.A.*, 327 F.R.D. 422, 431 (S.D. Cal. 2018) (including value of debt relief to calculate the common fund), *affirmed by Farrell v. Bank of Am. Corp., N.A.*, Nos. 18-56272, 18-56273, 18-56371, 2020 U.S. App. LEXIS 27980 (9th Cir. Sep. 2, 2020); *cf. Horn v. Bank of Am., N.A.*, No. 3:12 cv-1718-GPC-BLM, 2014 U.S. Dist. LEXIS 51972, at *18-19 (S.D. Cal. Apr. 14, 2014) (including estimate of tax deductions lost as a result of defendant's practices in total fund amount, even though settlement class members would need to file amended tax returns and have itemized deductions to avail themselves of the benefit). This makes sense because "[t]his debt, at present, is legally enforceable," dollar for dollar. *See Farrell*, 327 F.R.D. at 431.

          iii.    The timeline for funding the Settlement Amount was the subject of arm's-length negotiations that followed the outbreak of the ongoing COVID-19 Pandemic.

The AG objectors also complain that LBN will not have to pay from the cash fund until 2024, or earlier if LBN meets certain pre-COVID benchmarks. That payment schedule, however, was the result of extensive arm's length negotiations. While the parties were memorializing their agreement to a settlement in principle, the global COVID-19 pandemic arrived in the United States. 11/9/2020 Newmark Decl. ¶ 2. As a result, the Parties returned to an additional full day mediation with Jill Sperber

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW

to negotiate the agreed payment plan. *Id.* While the payment benchmarks allow for the possibility that LBN may pay sooner, the hard deadline in 2024 ensures that LBN will have to pay the fund it agreed to for past program participants and sponsors. The rest of the injunctive relief that benefits the class either has already taken effect as of preliminary approval, in the case of the bond caps, or will take effect as of final approval without delay. Notably, if Plaintiffs were to continue to litigate, they would still have to move for class certification, resolve LBN's appeal of the Court's decision to deny its motion to compel arbitration, survive summary judgment, win a trial, and prevail on appeal. Thus, even if the case did not stumble at one of the major litigation roadblocks, and then Plaintiffs won a trial, it would likely be long after 2024 before any favorable judgment. Meanwhile, if the AG objectors unseat the Settlement, critical injunctive relief terms would be delayed for years.

iv.     Contrary to the AG objectors' argument, the release is well-tailored and not overbroad.

The AG objectors also misunderstand the scope of the release. Contrary to the AG objectors' argument, the parties agree that the release for class members does not extend to personal injury claims because the release is limited to claims that arise from the facts alleged in this action. 11/9/2020 Newmark Decl. ¶ 3. Notably, the Settlement also explicitly preserves the claims of regulatory authorities, including state attorneys general with consumer protection enforcement authority.

v.     The Notice Plan approved by the Court was sound.

The AG objectors also criticizes the notice plan for relying on text messaging and publication notice. The objection states that the text message may be "treated like spam" and, even if it goes through, "it is likely that many class members will believe it to be spam and disregard it." The sole support for this sweeping statement is a footnoted report on notice by the Federal Trade Commission *which does not mention text message notice at all.* Rather, the report criticizes over-reliance on email. But text and email are fundamentally different, as users of both mediums should readily recognize, and as courts across the country have properly found when approving text message notice as a primary means of notice. "The reality of modern-day life is that some people never open their first-class mail and others routinely ignore their emails. Most folks, however, check their text messages regularly (or constantly)." *Lawrence v. A-1 Cleaning & Septic System Sys., LLC,* 2020 U.S. Dist. LEXIS 74685, 2020 WL 2042323, at

*5 (S.D. Tex. Apr. 28, 2020); *see also Yates v. Checkers Drive-in Rest., Inc.,* No. 17 C 9219, 2020 U.S. Dist. LEXIS 205241, at *9 (N.D. Ill. Nov. 3, 2020) ("However, many Americans use text messages as their primary contact and access text messages much more than they would email or regular mail."); *Thrower v. UniversalPegasus, Int'l Inc.,* 2020 U.S. Dist. LEXIS 161132, 2020 WL 5258521, at *12 (S.D. Tex. Sept. 2, 2020) ("[E]mails have the infelicitous tendency of slipping through the cracks, especially when folks have multiple e-mail accounts (e.g., work, personal, school) with which they must stay current . . . . The same cannot be said about text message; people keep up with them.").

This is particularly true here because text message was also the primary method by which LBN communicated with class members. *See Yates v. Checkers Drive-in Rest., Inc.*, No. 17 C 9219, 2020 U.S. Dist. LEXIS 205241, at *12-13 (N.D. Ill. Nov. 3, 2020) (ordering text message notice because "[t]he potential class members are . . . particularly comfortable communicating by text message . . . ."); *Bhumithanarn v. 22 Noodle Mkt. Corp.*, No. 14-CV-2625 RJS, 2015 U.S. Dist. LEXIS 90616, 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015) (allowing notice by text message where there was evidence that text messaging was defendants' preferred method of employee communication). Because of the class members' existing relationship with and previous receipt of text messages from LBN, it is particularly unlikely that they would treat the text messages as spam. Indeed, the high response rate—including over 6750 unique visitors to the settlement website and over 2,000 calls to the administrator (almost 1 in 20 class members)—strongly suggests that the text messages were highly effective here.

Text message notice was also appropriate here given the serious privacy concerns with physical addresses of undocumented immigrants falling into the wrong hands. That information could have subjected the claims administrator to a government subpoena and ultimately ended up with Immigration and Customs Enforcement.[9] Similarly, Class Counsel strongly disagree with the objection's suggestion that text notice should have been sent not just to the last known phone number for class members, but also to old phone numbers on record that might include friends or family. It would be highly inappropriate to, effectively, inform anyone other than the participants or sponsors themselves of the sensitive fact that the participant had been in immigration detention.

---

[9]  *See*  https://www.nilc.org/2018/01/25/how-ice-uses-databases-and-information-sharing-to-deport-immigrants.

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW

1    Another issue overlooked by the objection is the cost of mailing notice packets to tens of
2    thousands of people, which, as the authority recognizes above, likely may not have even been read.
3    Since there is a limited pool of funds, it is reasonable for the parties to have determined that text message
4    notice was the best practicable notice, more likely to be read than mail, and therefore to save the costs
5    of mail notice so that there can be a larger amount of direct monetary relief in the common fund. *See*
6    *Yates v. Checkers Drive-in Rest., Inc.*, No. 17 C 9219, 2020 U.S. Dist. LEXIS 205241, at *8 n.1 (N.D. Ill.
7    Nov. 3, 2020) ("The Court remains convinced that notice by electronic means, which is clearly more
8    convenient and substantially less expensive than notice by mail, is an adequate means to
9    disseminate notice in this case."); *Winans v. Emeritus Corp.*, No. 13-cv-03962-HSG, 2016 U.S. Dist.
10   LEXIS 3212, at *10 (N.D. Cal. Jan. 11, 2016) ("While Rule 23 requires that 'reasonable effort' be made
11   to reach all class members, it does not require that each individual actually receive notice." (citing *Rannis*
12   *v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010)).

13   The objection suggests that the absence of direct mail notice may prevent those eligible to
14   participate in the cash fund from submitting their I-391. Again though, there is no reason to believe
15   that the text notice, which directed class members to the settlement website, was insufficient. Moreover,
16   the Agreement makes clear that an I-391 form can be submitted up until six months *after* final approval.
17   The parties reasonably determined that many eligible program participants would have a legal
18   representative for their immigration proceedings. A core component of the publication notice was
19   therefore outreach to immigrant advocacy organizations who could amplify this aspect of the
20   Settlement. Finally, even with this outreach, Class Counsel note the Parties' estimate that the vast
21   majority of class members eligible for a cash payment already have an I-391 on file (approximately 2,200
22   of 3,000 estimated eligible class members). In short, the AG objectors present no persuasive argument
23   for the Court to reconsider its decision to approve the notice in this case.

24                              vi.    Class Counsel's requested fee is reasonable.

25   The AG objectors also criticize Class Counsel's fee request. As Class Counsel have set forth in
26   detail in their fee petition, the fee request is reasonable under either the lodestar or percentage of the
27   fund approach. To make it appear that Class Counsel seeks disproportionate relief, the AG objectors
28   again attempt to reduce this Settlement to its $750,000 cash payment component that is meant to

                                                    20

provide consideration to a small group of class members. But as discussed, debt relief is appropriately considered part of the $3.2 million settlement fund. Counsel seeks only the Ninth Circuit 25% benchmark of the settlement fund in this case. Although awards for injunctive relief are appropriate and routinely awarded, Class Counsel does not seek any additional fees for the monetary and other benefits of the programmatic relief that would immediately begin to benefit the majority of the class who are still program participants. And not only that—Class Counsel seeks no additional award for the thousands they paid in out-of-pocket costs litigating this case on behalf of the class.

Moreover, when the Class Counsel's requested fees is cross-checked with the lodestar approach, it is plain that Class Counsel is only seeking to recover a fraction of its lodestar and will not receive it until the class is also paid. The objection does not challenge the propriety of Class Counsel's lodestar or the detailed time entries included in Class Counsel's fee submission. As a result, the AG objectors provide no assistance to the Court in evaluating the reasonableness of Class Counsel's requested fee.

In addition, the very purpose of fee-shifting statutes like the CLRA is to encourage private attorneys general, like Class Counsel, to bring, prosecute, and successfully resolve cases like this. *See Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1171-72 (C.D. Cal. 2010) ("California's fee-shifting and private attorney general statutes incentivize counsel to take cases on behalf of plaintiffs who could not otherwise afford to vindicate their rights through litigation." (internal citations and quotations omitted)). To penalize Class Counsel and further reduce their fee sends exactly the wrong message to others considering similar affirmative litigation, undermining the legislature's chosen means of enforcing its law. *See Blackwell v. Foley*, 724 F. Supp. 2d 1068, 1081 (N.D. Cal. 2010) ("Unless Plaintiff's attorneys are reasonably compensated for all their time, the purposes of the private Attorney General statutes will not be met."). This argument is particularly apropos here given that it was Class Counsel's efforts that first shed light on the practices at the center of the litigation and fundamentally transformed them in ways that government enforcers have thus far been unable to do. *See* Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. Rev. 286, 316 (2013) ("When private class actions supplement or substitute for official regulation . . . the effect can be to overcome the inefficiency and limitations inherent in governmental

1    enforcement. In combination, the private attorney general concept and the class action serve to

2    subsidize the much-needed private enforcement of public policies . . . .").

3    ## VII.   THE CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES

4         The Parties agreed to certification of the Settlement Class, the Court conditionally certified it,

5    and the Court should now certify it at final approval. The Settlement Class is numerous, indeed tens of

6    thousands of consumers received notice in this case. There are common issues concerning the issues

7    related to LBN's contract and policies that predominate over individual issues. Plaintiffs are typical of

8    the class because they are LBN participants and sponsors just like the Settlement Class and were subject

9    to the same practices and contracts imposed by LBN. Plaintiffs have no conflicts with the class and

10   participated in this action, including by testifying at their depositions, and are adequate. Plaintiffs'

11   Counsel are experienced and adequate. Finally, class treatment is superior because the Parties agreed to

12   certification of the Settlement Class (Settlement Agreement Section VI), the Court conditionally

13   certified it, and the Court should now certify it at final approval.

14   ## VIII.  CONCLUSION

15        For the reasons stated herein, Plaintiffs respectfully request that the Court (1) grant final

16   approval of the Settlement Agreement; and (2) retain jurisdiction over the litigation and the Parties

17   throughout the term of the Settlement Agreement. By the separate motion filed on September 1, 2020,

18   Plaintiffs also request that the Court grant service awards of $10,000 to each of the three Class

19   Representatives, and award Class Counsel reasonable attorneys' fees and expenses in the amount of

20   $800,000, as set forth in the Settlement.

21

22   Dated: November 9, 2020                          Respectfully submitted,

23                                                    /s/ Annick M. Persinger

24                                                    ANNICK M. PERSINGER, SBN 272996
                                                      **TYCKO & ZAVAREEI LLP**
25                                                    10880 Wilshire Blvd., Suite 1101
                                                      Los Angeles, CA 90024
26                                                    Telephone (510) 254-6808
                                                      Facsimile (202) 973-0950
27                                                    apersinger@tzlegal.com

28

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JESSE NEWMARK, SBN 247488
AIDIN CASTILLO, SBN 280262
**CENTRO LEGAL DE LA RAZA**
3022 International Blvd., Suite 410
Oakland, CA 94601
Telephone (510) 437-1863
jnewmark@centrolegal.org
acastillo@centrolegal.org

NICHOLAS A. MIGLIACCIO, *pro hac vice*
JASON S. RATHOD, *pro hac vice*
**MIGLICACCIO & RATHOD LLP**
412 H St NE, Suite 302
Washington, DC 20002
Telephone (202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

*Attorneys for Plaintiffs*

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:17-CV-00755-CW